## Erthal v. Wynne

66

*William Manning*, for plaintiffs.
*Samuel High*, for defendants.

FORREST, P. J., September 25, 1963.—Plaintiffs filed their complaint in which they seek to enjoin the Commissioners of Hatfield Township from requiring any residents of the township, except in particular areas, to use and pay rental for a public sewage disposal system. The issues raised by the complaint and answer are:

1. Whether the individual sewage disposal systems of plaintiffs are individually and collectively functioning so as to cause no menace, threat or burden on the public health.

2. Whether the individual sewage disposal systems in the township which are presently unsatisfactory, can be corrected by the individual land owners.

3. Whether, except for the provisions of ordinance no. 85, the township authorities have neglected to take the necessary steps to require the owners of unsatisfactorily functioning individual sewage disposal systems to make the necessary connections.

4. Whether the action of the township commissioners in ordaining the *connection* by abutting owners with a public sanitary sewage system, as distinguished from the construction of the sewer system itself, was so unrelated to the requirements for public health as

to be arbitrary, unreasonable, and an abuse of discretion and hence illegal. The legality of the construction of the sewer system itself is not questioned.

5. Whether the lack of public sewers in adjoining municipalities with its resultant effect upon at least part of Hatfield Township is such as to make it useless and unreasonable to install a sanitary sewer system in Hatfield Township.

## Findings of Fact

1. Hatfield Township, Montgomery County, Pa., is a township of the first class. The township generally has soil of poor porosity, which tends to deter liquids from being absorbed.

2. Hatfield Township Municipal Authority is a corporation duly created on May 13, 1960, under the Municipality Authorities Act of 1945, Act of May 2, 1945, P. L. 382, sec. 1, et seq., 53 PS §301, et seq.

3. As of April 15, 1959, the Hatfield Township Commissioners voluntarily surrendered their authority over matters of local health.

4. On May 29, 1959, Harry G. Frey, Supervising Sanitarian, Montgomery County District, Pa., Department of Health, wrote to the Secretary of said township commissioners, inter alia:

"Inspections have revealed that problems with sewage disposal are extensive throughout the entire Township. Many individual sewage systems are illegally constructed whereby sewage is discharged on the surface of the ground, or in roadways and gutters.

". . . the extent of the sewage problem at the present date is such that reasonable doubt exists whether or not the problem can be solved on individual basis.

"I would like to recommend that positive planning be initiated now to provide public sanitary sewers within the Township. If this is not done, the alternative will be to seek individual connections which may prove to be costly and at best, provide only temporary relief. In-

vestigation into conditions in the Orvilla Park Section and initial efforts for abatement started on this date."

5. On July 19, 1963, Mr. Frey, sanitarian, as aforesaid, in his capacity as such, wrote to the solicitor for Hatfield Township, as follows:

"This letter is written to explain why the Pennsylvania Department of Health advocates the prompt installation of sanitary sewers in Hatfield Township.

"The general nature of the soils found in the township, as confirmed by information developed through the County Soil Survey as well as individual studies by professional registered engineers, indicates that the soils are unsuitable for sub-surface disposal of sewage effluent due to poor porosity.

"This fact is evidence by the many overflowing septic tank systems and direct discharge of laundry wastes to the surface of the ground. These insanitary, unsatisfactory conditions can be easily noticed by observing lawns, fields, and roadside storm drainage ditches throughout most of the Township; specifically, sections of Oak Park Road, Orvilla Road, Koffel Road, School Road, Bergey Road, Hatfield Valley Road, Broad Street, Vine Street, and Souderton Pike, as well as perhaps other places not fully documented. Illegal discharges directly into the Neshaminy Creek have also been noted. Conditions in the Orvilla Park development remain uncorrected and the situation is the same as recorded in the past.

"On those properties where soil stratas do allow sewage effluent to be absorbed into the earth, or where deep pits have been installed to accomplish this, sewage may not be noticeable on the surface of the ground, however, the underground water supply is then endangered by contamination. In the North Penn area many private homes, public establishments and industries rely upon water supplied by wells, and even the public water supplies in the neighboring communities do the same.

"Communicable diseases such as typhoid and paratyphoid fever, amebiasis, bacillary dysentary and infectious hepatitis can often be directly related to water supplies contaminated with human feces. Many foodborne and other intestinal diseases can be attributed to bacteria being transmitted by human feces to another person either directly, or by flies. The Department of Health is interested in trying to prevent such cases from happening by encouraging proper development of sanitary facilities.

"The only permanent solution to such problems is by providing public sanitary sewers and water supply systems, rather than by trying to build bigger and better septic tank systems. Such planning is a necessity to meet the growing demand for more homes, more schools, more industrial and recreational facilities. The local government developing such plans does so in the best interests of the people living in the municipality. While the initial cost may seem high to install sewers it may prove to be more economical than to waste the same amount of money trying to make a septic tank system work.

"Abatement of individual insanitary conditions through enforcement of State regulations can be costly to the individual property owner, and at best, usually provide only temporary relief. Pumping of cesspools is not the answer, for the material pumped out must also be disposed of somewhere, and in many instances this material is also illegally discharged into streams or clandestinely deposited and left to remain upon the surface of the ground.

"In any sewer plan there are usually some areas in the municipality where sewers can not be installed either for engineering or economical reasons. Charges for sanitary sewers can be apportioned to those furnished the service and the resale value of the property is usually increased by having sewers. . .

"It is expected that Hatfield Township will continue to show an active growth pattern and good planning for both public water and sewer systems are essential to the health of the present and future population."

6. On June 24, 1963, at the request of the Hatfield Township Municipal Authority, Tracy Engineers, Inc., made a detailed report of the proposed sewage project "designed for a flow from an equivalent population of 9,000 . . . [but with] "all pipelines and the hydraulics of the plan . . . sized to accommodate the flow from 13,000 persons". The plan which accompanied this report was adopted by the authority and by the township commissioners.

7. The proposed sewers will provide for sanitary sewage disposal from houses in the Garis subdivision, Heckler Lots, Orvilla Park, Lansdale Terrace, Lansdale Annex Heights, Colmar, Hatfield Park and Unionville areas of the township. There are sewered connections for 1,217 housing units out of a total of approximately 1,560 units in the township.

8. The Board of Commissioners of Hatfield Township on July 22, 1963, enacted ordinance no. 83 approving the plan of construction for sewage collection facilities within the township submitted by Hatfield Township Municipal Authority and the estimated cost thereof in the amount of $2,036,222, of which the amount to be assessed according to the foot front rule is $1,380,725. This ordinance was enacted *before* the commissioners had a public reading of Mr. Frey's letter of July 19th.

9. The said board of commissioners on the same day enacted ordinance no. 85, providing that:

"Section 3(a) Any person owning property accessible to a public sewer on which there is an occupied building shall, at his own expense, install sanitary facilities in such building and connect the same to the public sewer. . .

"Section 4 It shall be unlawful for any person owning or occupying a property on which there is a building required to be connected to a public sewer under the provisions of Section 3 hereof to construct or use on such property any privy, cesspool, septic tank or other device for the disposal of sanitary sewage."

The ordinance prescribes a sewer connection fee and penalty for violation of the ordinance.

10. Before the authority adopted the report and proposal prepared by Tracy Engineers, Inc., the authority engaged Albright and Friel, a firm of civil engineers, to plan the sewers to the south and west of Hatfield Borough, an area considerably less than that embraced in the present plan. Albright and Friel did so. That was a feasible sewer plan. George Metz also prepared a "preliminary report" in or before October 1960, for which the Commissioners paid $2,500.

11. For reasons of public health, there is a present need for sewers for landowners in the Orville Park and the Colmar sections of the township, and for servicing the A. M. Kulp School and the proposed Penfield Junior High School. In Orvilla Park since 1959, 60 homes have used a common sewer pipe to discharge sewage on the surface in an open field.

12. There are approximately 150 properties in the township where malfunctioning sewage disposal systems are evidenced by sewage coming to the surface or discharging into public waters. These properties are located in all four quadrants of the township, but especially in Orvilla Park. Few of them are in farm areas.

13. The open sewage may contain disease-carrying germs and it is a condition which menaces public health.

14. The properties of approximately 75 percent of the owners on School Road, including Krzos, Heyman, Bush, Carvolth, Alandis, Maier, Schultz, Bush and Rohr, each contain five or more acres.

15. Certain properties on Lenhart Road also contain five or more acres.

16. Some wells in the township are contaminated as a result of seepage from individual sewage systems, even though those systems are working properly, and that contamination is a menace to public health. Even deep wells may be polluted by such seepage. The Commonwealth has a record of one contaminated well in 1959. No steps were taken to stop the use or correct the contamination, other than the action mentioned in these findings.

17. Since the Commonwealth assumed the supervision of sanitation for the township, there has been a general postponement of the abatement of improperly functioning or illegal sewers, until the adoption of ordinances nos. 83 and 85.

18. The proposed public sewer system is economically and physically feasible and has been approved by the Sanitary Water Board of the Pennsylvania Department of Health.

19. The commissioners did not act fraudulently, arbitrarily or capriciously in enacting ordinance no. 83 or ordinance no. 85.

### Discussion

Plaintiffs do not challenge the validity of ordinance no. 83, which provides for the construction of sewer lines. They do challenge the validity of ordinance no. 85, which requires them to connect their sanitary facilities to the public sewer.

The First Class Township Code of June 24, 1931, P. L. 1206, sec. 2401, as amended, 53 PS §57401, provides:

"Townships may establish and construct a system of sewers . . . The township commissioners may permit, and, *where necessary for the public health* by ordinance, require any owner of property abutting on or adjoining any street or highway, in which is a sewer,

to make connections with such sewer or drainage in such manner as the commissioners may order for the purpose of discharge of such drainage or waste matter as the commissioners may specify . . ." (Italics supplied.)

The Act of 1931 was patterned after the Act of May 24, 1901, P. L. 294, which gave the township commissioners the authority ". . . when necessary for the public health, to require, adjoining and adjacent property owners to connect with and use the same; . . ."

In a case arising under the Act of 1901, the Superior Court approved the opinion of this court which stated, inter alia:

"House sewage is a dangerous element in all thickly settled communities. It is the duty of every municipality to make police regulations to protect the public health, and private property rights are held subject to such reasonable regulations. The authorities are not compelled to wait until a nuisance, per se, is established upon the property of an urban resident. It is their duty to formulate regulations that will prevent such an occurrence. . . The conditions are not special . . . [to the particular neighborhood] . . . but they apply to every community in a first-class township where there are large villages and closely built-up sections used for suburban homes.

"The sole question before us, is, whether the court . . . can say, that under the conditions established and uncontradicted, the commissioners were in error when they determined under their judgment and discretion, that it was necessary for the public health that the defendant should connect his buildings with the sewer provided by the township": Lower Merion Township v. Becker, 42 Pa. Superior Ct. 203, 206 (1910).

Where a municipality has authority to act, the court will not be hasty in convicting its officials of being unreasonable in the exercise of such authority. Municipal

corporations must exercise their powers in a reasonable, lawful and constitutional manner. If these limitations are not transgressed, courts cannot interfere with the ordinances of a municipality. "Courts will give a liberal construction to health and sanitary regulations of a municipality. 'One of the chief purposes for the institution of municipal government is the conservation of the public health and safety. No more important obligation is confided to municipal corporations. The nature of the ordinances they shall adopt for this purpose is largely a matter within the discretion of the local authorities. Unless they are clearly unreasonable and arbitrary, or demonstrably violative of some constitutional provision intended to protect the liberty of the individual or property rights, they will be sustained:' McQullin on Municipal Ordinances, page 681": Becker case, supra, page 207.

Commenting about an act which empowered borough authorities to compel owners of properties abutting on a public sewer to make connection with the sewer and which contained no proviso that the municipal authorities must first determine whether the public health demands such connection, this court said in its opinion in the Becker case, supra, page 208:

"An act similar to this was held valid in Commonwealth v. Roberts, 155 Mass. 281. The act of 1901 shows the trend of public opinion. It is a declaration by the legislature that house sewage is a menace to the public health and should be discharged into a public sewer, whether the abutting owner approves or disapproves of such action . . ."

The enabling act in the instant case resembles the act relating to boroughs discussed in the Becker case, supra. The pertinent act in the instant case states:

"Whenever a sewer or drainage system is established or constructed by any municipality authority within a township, the township commissioners shall be

empowered by ordinance to compel all owners of property abutting on, or adjoining any street or highway, in which such sewer or drainage system is located, to make connection with such sewer or drainage system . . .": The First Class Township Code, supra, sec. 2401.1, as amended, May 27, 1949, P. L. 1955, 53 PS §57401.1.

Plaintiffs contend that the authority which section 2401.1 of The First Class Township Code confers upon commissioners is subject to the same limitation as the authority conferred by section 2401, viz: *"where necessary for the public health."* We think that section 2401.1 is a *legislative* declaration applicable to first class townships as the *judicial* declaration in the Becker case was applicable to boroughs, that house sewage may be a menace to the public health in townships of the first class. Also, we deem the action of the township commissioners in ordaining the connection of certain houses with the public system to be in effect a declaration that sewage from such houses is in fact a menace to public health in this township. The system of individual sewage systems for each house has polluted the earth, polluted surface waters and streams, polluted subterranean waters, including wells, endangered health of people and animals who drink or wash with the same, provided breeding grounds for the multiplication and spread of disease germs.

The fact that particular individual home-owners have not hitherto or may not hereafter suffer from overflowing septic tanks or cesspools or seeping sewage waters cannot excuse them from participating in this community clean-up. No one can be sure what the extent of the mischief which he perpetrates upon his own property may be. Proofs may be difficult, if not impossible, to obtain. It is unreasonable, and, in our view of the case, unnecessary, for a township of the first class to prove that a particular property owner's sewage dis-

posal system is endangering public health, or in other words, is a nuisance, before such owner may be compelled to connect with the public sewage system.

It is well established that municipal officials have broad discretion to determine when there is a public necessity for sewer installations and connections: Diklich v. Johnstown, 118 Pa. Superior Ct. 282, 289 (1935); Siegfried v. South Bethlehem Borough, 27 Pa. Superior Ct. 456, 460 (1905); Michener v. City of Philadelphia, 118 Pa. 535 (1888); Fair v. City of Philadelphia, 88 Pa. 309, 311 (1879).

Certainly, the township commissioners' exercise of discretionary power in matters of local public health cannot be disturbed unless the exercise of power was attended with fraud, official misconduct or arbitrary and capricious abuse of power or discretion by the local officials: Hyam v. Upper Montgomery Joint Authority, 399 Pa. 446 (1960).

Here, the State Department of Health continuously recommended the establishment of public sewers in Hatfield Township. The need for such sewers is clear as is exemplified by the facts found by the chancellor. Even plaintiffs' witnesses offered testimony of instances of sewage being discharged on the surface of the ground for a period of years. Soil porosity is poor in many areas and we have no doubt that after much expert study and advice the township commissioners concluded that the installation of the sewers and of the connections between sewers and buildings along the sewer line was in the best interests of public health.

Undoubtedly the commissioners had other alternatives. It may be that it was not necessary at this time to require each and every house-owner along the extensive network of sewers to connect his building to the sewers in order to maintain the public health. It may be that a sanitary sewer system never was constructed anywhere which was a visible, provable benefit to every

property fronting thereon. However, it would be an intolerable burden on a municipality to require its officials to decide which properties have no present need for sewers and to exempt such properties from the requirement of sewer connections. This is a matter of practicality. Abstract justice is not always accomplished. However, as we have already stated, in the absence of bad faith, fraud, capricious action or abuse of power, the court will not inquire into the wisdom of legislative action such as that here subject to scrutiny: Parker v. Philadelphia, 391 Pa. 242 (1958).

### Conclusions of Law

1. Townships of the first class are empowered, whenever a sewer system is established by a municipality authority within such townships, to compel each and every owner of property abutting on, or adjoining any street or highway in which such sewer is located to make connection therewith, whether or not the connection by any particular owner or owners is proven to be necessary for the public health.

2. There is a presumption that the commissioners of Hatfield Township acted properly and for the public good in enacting ordinance no. 85.

3. The presumption mentioned in conclusion of law no. 2 has not been rebutted.

4. Plaintiffs have failed to prove that the commissioners of Hatfield Township acted in bad faith, fraudulently, capriciously, arbitrarily or otherwise misconducted themselves in enacting ordinance no. 85.

5. The complaint should be dismissed and plaintiffs should pay the costs of this action.

### Decree Nisi

And now, September 25, 1963, the complaint is dismissed, costs on plaintiffs. The prothonotary shall give prompt notice hereof to the parties. Exceptions may be filed within 20 days after such notice. If no exceptions

78

are filed, this decree nisi shall be entered by the prothonotary, upon praecipe, as the final decree.