Hyam *v.* Upper Montgomery Joint Authority.

Argued April 18, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

reargument refused May 26, 1960.

*Victor J. Roberts,* and *High, Swartz, Childs & Roberts,* for plaintiffs.

*Raymond Pearlstine,* with him *C. Edmund Wells, Williard C. Hetzel,* and *Wisler, Pearlstine, Talone & Gerber,* and *Rhoads, Sinon & Reader,* for defendants.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, April 26, 1960:

On March 21, 1960, thirteen owners of realty in the Boroughs of East Greenville, Pennsburg and Red Hill, Montgomery County, instituted an equity action in the Court of Common Pleas of Montgomery County against the aforesaid Boroughs and the Upper Montgomery Joint Authority[1] to restrain them, jointly and severally, from proceeding with a contemplated construction and financing of a sewage collection system, a sewage treatment plant and other related sewer facilities "in and

---

[1] This Authority was created by the three Boroughs under the provisions of the Pennsylvania Municipal Authority Act of May 2, 1945, P. L. 382, as amended and supplemented, 53 PS §301 et seq.

adjacent to and for rendering service in and for" the said Boroughs.

On March 31, 1960 the Authority and three Boroughs filed preliminary objections in the nature of a demurrer to the property owners' complaint.

On the same date the Authority and three Boroughs filed a petition in this Court requesting that we take original jurisdiction of the proceeding. Upon answer being filed to that petition, on April 4, 1960, in view of the importance of the question involved, we directed the issuance of a special certiorari to the Court of Common Pleas of Montgomery County removing therefrom the record and all papers in the proceedings to this Court "for consideration and action thereon as if said case were [before this Court] on original jurisdiction".[2] Such is the present posture of this litigation.

The instant matter is presented upon the pleadings, i.e., the complaint and the preliminary objections thereto in the nature of a demurrer. In passing upon the validity of these preliminary objections certain well-established principles are applicable: (1) preliminary objections admit as true only such facts as are well pleaded, material and relevant and only such infer-

---

[2] Article V, §3, of the Pennsylvania Constitution vests in this Court "original jurisdiction in cases of injunction where a corporation is a party defendant" and such jurisdiction extends to corporations municipal in nature: *Wheeler v. Philadelphia*, 77 Pa. 338; *DeWalt v. Bartley*, 146 Pa. 525, 23 A. 448; *Bruce v. Pittsburg*, 161 Pa. 517, 29 A. 584; *Hoffman v. Pittsburg*, 229 Pa. 36, 78 A. 26; *Raff v. Philadelphia*, 256 Pa. 312, 100 A. 815; *Wentz v. Philadelphia et al.*, 301 Pa. 261, 151 A. 883; *Mistick v. Cammack*, 397 Pa. 296, 154 A. 2d 588. The acceptance of such jurisdiction is a matter solely discretionary with this Court: *Clark v. Washington Borough*, 145 Pa. 566, 23 A. 333; *Wentz v. Philadelphia*, supra; *Commonwealth ex rel. Paylor v. Claudy*, 366 Pa. 282, 77 A. 2d 350; *Mistick v. Cammack*, supra.

ences as are reasonably deducible from such facts: *Adams v. Speckman,* 385 Pa. 308, 122 A. 2d 685; *Gardner v. Allegheny County,* 382 Pa. 88, 114 A. 2d 491; *Byers v. Ward,* 368 Pa. 416, 84 A. 2d 307; (2) preliminary objections admit neither conclusions of law nor inferences unwarranted by the admitted facts nor argumentative allegations nor expressions of opinion: *Adams v. Speckman,* supra; *Detweiler v. Hatfield Borough School District,* 376 Pa. 555, 559, 104 A. 2d 110; *Byers v. Ward,* supra; *Kaufmann v. Kaufmann,* 222 Pa. 58, 70 A. 956; (3) if to sustain the preliminary objections of a defendant will result in a denial of a plaintiff's claim or a dismissal of plaintiff's suit, such preliminary objections will be sustained only in those cases which are clear and free from any doubt: *Adams v. Speckman,* supra; *Sun Ray Drug Co. v. Lawler,* 366 Pa. 571, 79 A. 2d 262; *Davis v. Investment Land Co.,* 296 Pa. 449, 146 A. 119.

The complaint of the realty owners contains 18 paragraphs. Paragraphs 1 to 5, inclusive, describe the plaintiff property owners and the corporate defendants. Paragraph 6 avers that the three Boroughs on March 7, 1960, by ordinance simultaneously adopted, approved an agreement entered into on March 3, 1960 by the three Boroughs with the Authority for the construction of a sanitary sewage collection system, a sewage treatment plant and other related sewer facilities in said Boroughs. Under this agreement the Authority was to effect the construction of this project and the three Boroughs were to ensure that abutting property owners would connect with the sewer system and would grant certain easements and rights of way to the Authority. Paragraph 7 recites that, prior to the adoption of these ordinances, the three Boroughs, simultaneously on February 8, 1960, adopted certain ordinances. These ordinances approved the Authority's

plan of construction,[3] approved the estimated cost of said sewer facilities assessable in each of the three Boroughs and the aggregate estimated cost of the entire system and, further, approved the Authority's proposal to charge approximately $866,264 of the total aggregate cost against properties benefited, improved and accommodated thereby, said assessment to be in accordance with the foot front rule. Paragraph 8 avers that the Authority's engineers' report described the proposed sewer system as designed to serve 1534 presently existing dwelling units and projected a total estimated cost for the construction and financing of said sewer facilities at $2,592,000 and an estimated average annual sewer rental per dwelling unit of $69.40.

Paragraphs 9 to 12, inclusive, set forth a history of the events which preceded the adoption of the Boroughs' ordinances. The three Boroughs on February 24, 1947 had engaged the same firm of consulting engineers to make a preliminary survey and study of the collection and disposal of sewage from the tri-borough area and such written survey and study was prepared and submitted to the three Boroughs on July 9, 1947. This survey and study estimated a total cost of $763,-000 for the construction of the sewer facilities to serve 1259 then existing dwelling units at an average annual rental per dwelling unit of $39.40 and said survey and study suggested that, in view of the then high construction costs, it was inadvisable at that time to proceed with the construction of the sewer facilities. Eleven years later—1958—the three Boroughs received from the same firm of consulting engineers another estimated cost of the construction and financing of sewer

---

[3] A plan dated January 25, 1960 which had been prepared and submitted to the Authority by a certain named firm of consulting engineers.

facilities to serve 1463 then existing dwelling units at $1,950,000 at an average annual rental per dwelling unit of $49.95.

Paragraph 13 sets forth that, on February 5, 1960 at a public meeting, a representative of the same firm of consulting engineers explained that the discrepancy between its estimates of construction and financing costs in 1947 and in 1960 was due to the fact that the system proposed in 1947 was designed for an ultimate 5000 dwelling units, while the system proposed in 1960 envisioned an ultimate 6000 dwelling units.

Paragraph 14 avers that the property owners then engaged their own consulting engineers. These engineers have advised that the Authority's proposed sewer system (a) is not economically feasible, (b) does not propose a complete sewer system and (c) will only partially abate sewage discharge into waters of the Commonwealth. Furthermore, these engineers advised that the contemplated construction and financing of this project would place an unnecessary and unjustifiable burden upon a majority of the property owners for the benefit of a relatively few property owners whose sewage may have been polluting waters of the Commonwealth; that a third pumping station to eliminate the pollution of waters of the Commonwealth (proposed to be constructed within three years) would require additional sewer facilities presently not economically feasible and impossible to accomplish within the three year period; that the average property owner in the tri-borough area—with an average annual income of $3,800—cannot financially bear the estimated initial expense of $1,000 in addition to the estimated annual minimum sewage rental of $69.40.

Paragraph 15 avers that, when the property owners attempted to bring to the attention of the Authority and the Boroughs the discrepancies in cost (1947, 1958 and 1960) and to obtain a reconsideration of their

approval of the engineers' report and the consideration of other alternatives, the Authority and the Boroughs insisted that any further investigation be set aside, that the proposed plan of sewer construction be "immediately and arbitrarily approved", and that the Authority, by letter, threatened the plaintiffs and other property owners that, in the event they persisted in legal action, the Authority would hold them responsible, jointly and severally, for damages. Paragraph 16 avers that the Authority has obtained bids for the sale of bonds for financing the construction of the proposed project and either has sold or is about to sell such bonds and to award contracts for the construction.

Paragraphs 17 and 18 aver that "defendants have been guilty of a manifest abuse of the legal discretion vested in them [legally] . . ., . . . they have acted arbitrarily, unreasonably, capriciously and not in good faith, so that their decisions and actions . . . have been and are of an unlawful nature . . ." and that, unless defendants are now restrained, immediate severe and irreparable damage will be caused the property owners.

The preliminary objections raise principally two contentions: (1) that the complaint does not set forth a cause of action; and (2) that the property owners are guilty of laches.

Consideration of the pleadings is rendered more understandable by an examination of the factual background of this controversy as presented by the petition seeking our assumption of original jurisdiction and the answer thereto.

In October, 1946 the Sanitary Water Board of the Commonwealth ordered the three Boroughs to either abate the discharge of sewage into waters of the Commonwealth or to submit, jointly or severally, on or before July 1, 1947, a comprehensive sewer plan to the Board for its approval. On or about July 9, 1947 a

firm of consulting engineers employed by the three Boroughs rendered a preliminary report of a survey and study which it had undertaken and, subsequent thereto, a public meeting was held under the auspices of the East Greenville Borough for a full discussion of the engineers' report. At a later hearing before the Board one of the matters discussed was the problem of sub-surface drainage in the Borough which rendered impossible private abatement of sewage discharge into Commonwealth waters.

Beginning in November, 1959 the Authority publicly advertised for bids for the construction of the sewer system and, pursuant to such advertising, seven bids were received from general contractors. On December 21, 1959 the Authority's consulting engineers reported that the overall cost of the coordinated sewage system, based upon the actual bids received, would be $2,022,447.83.[4] The Federal government has made available to the Authority for this project funds not to exceed $250,000.

The Authority has entered into a contract for the construction of the sewer system, has sold its bonds, as of January 20, 1960, and the bonds were due for delivery on March 29, 1960 but due to this litigation delivery of the bonds has not been made.

On February 5, 1960 at the request of counsel for certain property owners [not the present counsel for the instant property owners] a public meeting was held at which questions were addressed to a panel concerning the proposed construction and financing of the sewer system. This panel was composed of representatives of the Commonwealth's Department of Health, of the Authority's engineers, of bond counsel, of the Au-

---

[4] It should be noted that the property owners aver that, on January 25, 1960, the engineers reported an overall cost of $2,579,547.88.

thority and the Boroughs, and of the bond under-
writers.

Three days later three of the present plaintiffs, to-
gether with nineteen other property owners, instituted
an equity action in the Court of Common Pleas of
Montgomery County against the Authority and the Bor-
oughs to restrain the construction of the sewage sys-
tem. Preliminary objections to this complaint were
filed. *On February 11, 1960 in open court the prop-
erty owners withdrew their action.* It was not until
the withdrawal of this action that the Authority en-
tered into the construction contract, accepted the Fed-
eral grant and scheduled a date for the delivery of the
bonds.

Subsequent to these events the present action was
filed.

Does this complaint present a justiciable cause of
action? Our analysis of its allegations indicates that
it does not. With one exception, infra, the property
owners' accusations are generalities and conclusions
unsupported by factual averments. Allegations that
the proposed sewer plan is economically not feasible,
incomplete and will result in the imposition of an un-
necessary and justifiable burden on the property own-
ers in the tri-borough area find no support in the facts
averred in this complaint. Assuming the truth of all
the well pleaded, material and relevant facts and in-
ferences reasonably deducible therefrom, such facts
and inferences do not establish any such abuse of dis-
cretion or arbitrary and capricious action on the part
of these municipal officials such as warrants judicial
interference. *Nowhere in the proceeding is there any
allegation of any fraud or misconduct on the part of
these municipal officials.* Cf.: *Mistick v. Cammack,*
supra.

The thrust of the property owners' accusations is
that the Authority's consulting engineers estimated the

cost of the proposed construction in 1946 at $763,000 whereas the same engineers, in 1960, estimated the cost of the proposed construction at $2,592,000. However, taking into consideration the larger number of dwelling units to be serviced, the tremendous and unprecedented rise in the cost of construction of *any* project during the fourteen year period between 1946 and 1960 and other factors, the increase in the estimated costs of this project between 1946 and 1960 does not, standing alone, justify our interposition in this matter.

The property owners want a hearing.[5] Even if such hearing were held and *all* the facts *alleged* in the complaint were *proven*, judicial interference would be unwarranted. The legislature has vested in both the Authority and the Borough officials the power and responsibility of conducting governmental affairs in their respective areas: to such officials on the local level is given the right to exercise both judgment and discretion within the sphere of the legislative grant. Courts should be loathe to interfere with or control the performance of the duties of such municipal officials: fraud, official misconduct, arbitrary and capricious abuse of power or discretion by municipal officials alone justify judicial intervention.

Such a doctrine finds support in prior decisions of our Court. In *Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 572, 109 A. 2d 331, Chief Justice HORACE STERN, speaking for this Court, stated: "By a host of authorities in our own and other jurisdictions it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not in-

---

[5] If a hearing were to be held the matter would be remanded for that purpose to the court below.

quire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion." In *Neizer v. Schuylkill Township School District et al.,* 384 Pa. 323, 121 A. 2d 93, our present Chief Justice, speaking for a unanimous Court, approved an opinion of the Court of Common Pleas of Chester County which read, in part, as follows: "The Board of School Directors is the Authority vested with the duty of saying what facilities are adequate and proper for the needs of the School District. What are adequate and proper facilities is a matter of opinion about which reasonable people may differ. Because these plaintiffs are of the opinion that the defendants built too large or elaborate a structure is no reason for holding that they were guilty of bad faith." In *Nine-Ten Chestnut Corporation v. Philadelphia Parking Authority,* 373 Pa. 274, 95 A. 2d 553, we held that a court has no authority to overrule a determination made by an authority to construct a particular parking garage, at least in the absence of any accusation of fraud or misconduct or facts indicating arbitrary or capricious conduct on the part of the Authority. In *Parker v. Philadelphia,* 391 Pa. 242, 137 A. 2d 343, Mr. Justice CHIDSEY, speaking for this Court, stated: "It is not sufficient that appellants disagree with the *wisdom* of the City Council's action. A court of equity will not substitute its determination of what may be wise for the

decision of the appropriate governmental body, absent a showing of bad faith, abuse of power, etc." (p. 249).

We have long recognized a presumption that municipal officers properly act for the public good: *Parker v. Philadelphia,* supra; *Downing v. Erie City School District et al.,* 360 Pa. 29, 61 A. 2d 133; *Gericke et al. v. Philadelphia et al.,* 353 Pa. 60, 44 A. 2d 233. Presumptively, these officials must be regarded as acting properly and for the public good. Absent any allegations in this complaint of either fraud or misconduct and absent any allegations of fact which would indicate that these municipal officials have acted or are acting either in abuse of their power or in a capricious or arbitrary manner, judicial intervention cannot be justified. To label the actions of these officials as capricious or arbitrary does not make them so. A hearing might indicate that the proposed plan is not as complete as it might be, that it involves a greater expenditure of money than the results would justify or that it was unwise at this time to enter upon such a plan. However, the determination of such facts has been placed in the first instance in the discretion and judgment of the Authority and Borough officials and upon them has been placed responsibility under the law for such determination and judgment. Unless it can be shown—and the facts alleged in the complaint, even if proven, do not so show—that the discretion and judgment of such officials have been motivated by fraud or by complete lack of responsibility or by arbitrary considerations or capricious beliefs, no court should substitute its judgment for that of such officials. To do so would constitute an unwarranted judicial interference with the duties of duly appointed and elected public officials.

Even if the property owners proved all the facts set forth in their complaint, as distinguished from the conclusions of law, such facts do not show such con-

duct on the part of the municipal officials as to justify our interference with their discretion and judgment.

In view of the conclusion which we have reached, it is unnecessary to consider the question whether the property owners are guilty of laches under the circumstances.

The preliminary objections are sustained and the complaint dismissed with prejudice at plaintiffs' costs.