## Cain v. Winter

*John McAuliffe, Jr.* and *Ronald F. Kidd,* for plaintiff.

*Paul Rucci, Assistant City Solicitor,* and *Gilbert Stein,* for defendants.

TAKIFF, *J.*, April 1, 1975—This complaint in equity and petition for injunctive relief seeks rescission of a letter of award issued by the Procurement Commissioner of the City of Philadelphia to Smith-Edwards-Dunlap Co. (hereafter referred to as "Smith") pertaining to the printing of election materials required for the 1975 Philadelphia primary and general elections and the award of the contract for such printing to Philadelphia Letter Shop, Inc., of which plaintiff is president. The matter was submitted on a rule to show cause why a preliminary injunction should not issue. Preliminary objections to the complaint were filed on behalf of all parties defendant other than Smith. While a formal answer was not filed, the averments of the complaint were considered as denied and at issue, except for averments of paragraph 8 of the complaint which were stipulated as admitted. By agreement of all parties, the matter was the subject of full testimony and argument and dealt with as on final hearing.

We have concluded that the rule for injunction should be discharged and the complaint in equity dismissed.

The identity of plaintiff, the capacity in which he brought this action and the relief sought is somewhat disarrayed. Philadelphia Letter Shop, Inc. (hereafter referred to as "Philadelphia Letter"), by its title is clearly identified as a corporate entity. It was a bidder pursuant to an invitation published by the City of Philadelphia Procurement Department for a printing supply contract identified as Bid 160A which, after rejection of all bids, was readvertised as Bid 160AR. In the complaint, plaintiff is identified and described as Gerald R. Cain, "a taxpayer and President of Philadelphia Letter Shop, Inc." In the affidavit annexed to the complaint, he is iden-

tified as plaintiff in his individual capacity. The substance of the averments of the complaint, however, unequivocally identify Philadelphia Letter as the bidder, not plaintiff, Gerald R. Cain, but the prayer for relief, inter alia, is that "the Bid be awarded to plaintiff," patently demonstrating that the real moving party is the unsuccessful bidder and not the taxpayer. A short answer, therefore, to this proceeding could be to sustain the preliminary objections filed, because a disappointed bidder has no standing in a proceeding of this type.

At trial and during argument, there was a fundamental inconsistency in the nominal posture of plaintiff as a taxpayer. He argued that if the conclusion of the Procurement Commissioner to reject the bid of Philadelphia Letter as the "lowest responsible bidder" should be sustained, the bid of Smith should also be rejected for noncompliance with the bid instructions and the contract should be awarded to the third bidder, Allen Lane & Scott whose base bid price was $50,858 higher than that of Smith. Even in periods of inflation, such as we are now undergoing, this approach though lending great support for the mandate of exact compliance with legal requirements, which is commendable, hardly lends credence to the role of plaintiff as a taxpayer seeking to avoid the dissipation of public funds. Because of the importance of the matters in controversy, however, we have determined to disregard matters of form and deal with the substantive issues, as if this were a bona fide taxpayer's action.

At the hearing, an inordinate amount of testimony and evidence offered by plaintiff was addressed to events which transpired after February 26, 1975, when the determination was reached by

the Procurement Commissioner to award Bid 160AR to Smith. Matters involving a clerical error, speedily rectified, as a result of which there was a short-lived appearance of the award having been made to Philadelphia Letter, were exhaustively examined. This testimony was received because of the allegation in the complaint that the award of bid to Smith was arbitrary and an abuse of discretion and the preliminary statement, made by counsel for plaintiff, that the award was the product of bad motive and collusion. The withdrawal of the latter assertions at the conclusion of the testimony, however, makes any reference to events after the Procurement Commissioner's determination of February 26th to award the contract to Smith, totally irrelevant.

## HISTORY

In the early part of 1974, the City Controller, being concerned with the high cost of election printing and the seeming absence of qualified competitive bidders, which might be conducive to the reduction of costs, initiated investigation into alternative procedures. One possibility considered involved a capital acquisition of printing equipment by the City of Philadelphia, suggested by the Procurement Commissioner, whereby these materials could be printed by the city printing department. This was rejected for a variety of reasons not now germane. A second alternative involved a revision of specifications as to size of printed materials and quantities so as to enable a larger number of printers to be able to perform the work within the capacity of available equipment for this somewhat complex job, thereby enhancing the likelihood of great-

er competition. After involvement by the City Controller, the City Commissioners and the Procurement Commissioner, new specifications were promulgated, reduced quantities of certain of the items of printing were established and bids were invited for submission on February 10, 1975, for the official printed materials required for the primary as well as the general elections for 1975. The effectiveness of the effort initiated by the City Controller is reflected in the fact that these materials would be produced at a cost approximately $200,000 less than in prior years.

On the due date, three bids were received. The base bid of Philadelphia Letter was in the sum of $223,000; the base bid of Allen Lane & Scott was $326,000 and the total bid of Smith was $404,000. The scope of the work encompassed five separate items for the primary election work and a like number of essentially similar items for the general election. When these bids were studied by the Procurement Commissioner, in consultation with the representatives of the City Controller and the County Commissioners it was immediately observed that the bid of Philadelphia Letter was not accompanied by an adequate bid deposit, as required by the conditions of bidding. The bid of Allen Lane & Scott suffered from a deviation from the specifications for the ballot label strips for voting machines, a critical variation which could result in erroneous exercise of choice by voters and prejudice to candidates. The bid of Smith was regarded as too high. The Procurement Commissioner thereupon determined to reject all bids and readvertise, a conclusion which has not been attacked.

New bids under identical specifications and instructions as those originally solicited were invited

for submission on February 20, 1975, a date which would permit compliance with the required advertisement in two successive weeks. Bids were then received from the original three bidders. In the interim, however, the Procurement Commissioner ordered inspections of the plant facilities of Philadelphia Letter and Allen Lane & Scott as well as credit reports from Dun & Bradstreet on all the earlier bidders. No inspection of the plant of Smith was ordered because that firm's plant had been inspected several years earlier, it had effectively performed the printing work required under this contract for many years and, hence, its capability to do the work effectively and on time was well known.

The plant inspection of Philadelphia Letter, attended by representatives of the Procurement Commissioner, the City Controller and the City Commissioners, disclosed approximately 13 employes and an admitted capability of doing approximately 20 percent of the work required. It was made known by representatives of Philadelphia Letter that the remaining 80 percent of the work, if the contract was awarded to it, would be done in the plant of Lyon & Armour, of Cornwells Heights, whose facilities the visitation group were invited to inspect. While such inspection was done by the others, who found them adequate, the representatives of the Procurement Commissioner did not go there, having been instructed to inspect the facilities of the bidder only. The facilites of Allen Lane & Scott were inspected by representatives of all the enumerated city agencies and determined to be adequate to fully perform the work.

At the public bid opening on February 20, 1975, the Philadelphia Letter base bid for the entire job

was $287,788 (an increase of over $64,000 over its original bid) plus an additional charge under items 4 and 9 of the invitation, for additional absentee ballots over those required by the base bid, of $41.30 "per 100 any group" and $25.30 "per 100 reprints." The bid of Smith for the entire job was $289,000, with no additional charge for additional absentee ballots or reprints (a reduction of $115,000 from its original bid). The bid of Allen Lane & Scott was $339,858 (an increase of $13,858 over its base bid) plus additional charges of $500 and $500 for additional absentee ballots and/or reprints under items 4 and 9 of the invitation.

The items as to which extra charge was noted by two of the three bidders were specified as follows in the invitation for item 4:

"4. OFFICIAL ABSENTEE BALLOTS 36,000 ea.

"Absentee Ballots for the Primary must be printed for each of the approx. 1777 Divisions within 66 wards in the 10 Councilmanic Districts.

"Ten (10) for each division for each Party will be imprinted Ward and Division No. and Party. The above quantity reflects 18,000 for each Party, presently 2 Parties anticipated—If additional Parties or reprints as needed will be ordered with per 100 bid.

"Candidates names change 10 times, imprints 1777 times, Party designation 2 times. (Division, Ward & Party imprint).

"Each 10 will be serial-numbered 0001-0010 on perforated stub and staple padded to chipboard.

"STATE LOT PRICE.

"STATE PRICE PER 100 ANY GROUP (DO NOT INCLUDE IN LOT PRICE)

"$_____

"STATE PRICE PER 100 REPRINTS (DO NOT INCLUDE IN LOT PRICE)
"$_____"

Essentially the same requirement and provision for extra charge is restated under item 9, dealing with absentee ballots for the general election.

As of the date of bid opening, it was known that the anticipation of only two parties, reflected in the bid invitation, was not to be realized; a third party, the Constitutional Party, was in the primary election, presenting the probability of a requirement for the printing of absentee ballots in connection therewith. The time for withdrawal of any party has passed as of the date of this adjudication and we are not advised of any withdrawals. A precise calculation of the anticipated extra charge which would be entailed by reason of the third party was never presented in evidence. Predicated on prior years' experience, a representative of the Procurement Department estimated that this might involve an extra charge of $4,300. The details of that prior experience were never fully exposed nor was any evidence introduced as to the number of registered Constitutional Party voters as of 1975 or their distribution in wards and divisions. In plaintiff's supplemental requested findings of fact it is asserted that in 1974 there were only 149 registered Constitutional Party voters in Philadelphia, with no indication as to breakdown by ward or division. Since absentee ballots theoretically could be required for each of 1777 divisions, each division representing a "group" for this purpose, there could be a maximum extra charge for this item at the price of $41.30 "per 100 any group" of $73,390.10 for the primary election alone, to be added to the base price

of Philadelphia Letter with a duplication of a like extra charge for the general election. The extra charge of Allen Lane & Scott, at $500 "per 100 any group" would vastly exceed this calculation. Assuming the accuracy of plaintiff's representation of the number of registered Constitutional Party voters to be valid and subsisting for the 1975 election, there is no way of determining how many divisions are reflected in that voter distribution. One can only speculate as to whether those voters are distributed in 1 or 149 different divisions, reflecting potential extra cost for this item, again at the bid quoted by Philadelphia Letter, as ranging between $41.30 or 149 times that amount, which would yield $7,355.70, as an extra charge for each election, primary and general.

The only certainty is that the base bid of both Philadelphia Letter and Allen Lane & Scott will be increased by reason of third-party absentee ballots for both elections by some indeterminate amount; a fact which was known and considered by the Procurement Commissioner in evaluating the bids of Philadelphia Letter and Allen Lane & Scott but which was of no significance in evaluating the bid of Smith because they had "no charge" for this extra work.

In the evaluation of the "lowest responsible bidder," the Procurement Commissioner reached the tentative conclusion on February 21, 1975, that the award should be made to Smith. In arriving at this conclusion, exclusive of the effect the "extra charge" for absentee ballots would have upon a true determination of which was the "low" bid among these three bidders, the Procurement Commissioner had the problem of determining if the nominal low bid was that of the "lowest *respon-*

*sible* bidder." In addition to the fact that Philadelphia Letter admittedly could not perform all the work in its own shop but would have to subcontract, i.e. "delegate the performance" of a very substantial part of the work, contrary to the conditions of bidding, the Procurement Commissioner considered the past performance of an earlier city contract by this bidder, which had been found not wholly satisfactory. Additionally, the commissioner determined that the amount of this contract approached the prior annual gross dollar volume of printing work done by Philadelphia Letter and the credit standing of the contemplated subcontractor was questionable. During a meeting with the City Commissioners and a representative of the City Controller, an item-by-item award divided as between Philadelphia Letter and Allen Lane & Scott, only, was considered and rejected by the Procurement Commissioner; Smith had not submitted their bid on an item-by-item basis and, therefore, could not be included in such a comparison.

Under such an analysis, aside from the fact that Philadelphia Letter could not perform eight of the ten required items in its own facilities, and assuming its "responsibility," such a fragmented award would have yielded a base price of $268,578 or nominally $19,210 lower than the Smith total bid, without any allowance or calculation for the extra charge in the Philadelphia Letter (the low bidder on this item) bid for additional absentee ballots. Further, an award to Philadelphia Letter of items 4 and 9 alone, being those items which it could perform in its own plant without delegation, and the award of the remaining items to Allen Lane & Scott, would have yielded a total base cost of $319,878 or $30,878 in excess of the total bid of

Smith, even without any calculation of the extra costs in the Philadelphia Letter bid required for absentee ballots.

Under the totality of circumstances, the Procurement Commissioner on February 26, 1975, concluded that Philadelphia Letter was not the lowest responsible bidder. He further concluded that it was not to the best interest of the City of Philadelphia to fragmentize the award as between two bidders, one of whom was incapable of performing its own share of the bifurcated bid within its own facilities, contrary to the prohibition of the conditions of bidding. As between the remaining two bidders, Smith and Allen Lane & Scott, the latter's base bid was $50,858 higher than the former's, exclusive of extra costs. Having a history of satisfactory performance by Smith as the contractor on prior awards of similar work, with a plant of 235 employes, adequate financial standing and experience and demonstrated plant capability, the Procurement Commissioner concluded that it was the "lowest responsible bidder." Although the Smith bid did not comply with the bid instructions with respect to itemization of the various component items of the bid, the unqualified right of a representative of the City Commissioners to be present on the premises from the time of award of bid until completion, and the submission of its bid on an "all or none" basis, it was the Procurement Commissioner's conclusion that an award to that firm was in the best interest of the city. He, accordingly, directed the issuance of the notice of award of bid to Smith, which is the subject of this litigation.

## DISCUSSION

The controlling principles have been stated in

Weber v. Philadelphia, 437 Pa. 179, 183 (1970), where it was said:

"In this area of the law, certain principles are well settled and stem, in large measure, from judicial respect for the doctrine of separation of powers in government. First, it is to be presumed that municipal officers properly act for the public good (Robinson v. Philadelphia, 400 Pa. 80, 86, 161 A. 2d 1, 5 (1960); Hyam v. Upper Montgomery Joint Authority, 399 Pa. 446, 457, 160 A. 2d 539, 545 (1960)). Second, courts will not sit in review of municipal actions involving discretion, in the absence of proof of fraud, collusion, bad faith or arbitrary action equating an abuse of discretion, (Blumenschein v. Pittsburgh Housing Authority, 379 Pa. 566, 572, 109 A. 2d 331, 334-35 (1954); Hyam, supra, 399 Pa. at 457, 160 A. 2d at 545). Third, on judicial review, courts, absent proof of fraud, collusion, bad faith or abuse of power, do not inquire into the *wisdom* of municipal actions and *judicial* discretion should not be substituted for *administrative* discretion (Goodman Appeal, 425 Pa. 23, 30, 227 A. 2d 816, 820 (1967); Parker v. Philadelphia, 391 Pa. 242, 249, 137 A. 2d 343, 347 (1958)). Fourth, if a municipality, in connection with competitive bidding, is empowered to do so, it may reject any and all bids in the absence of fraud, collusion, bad faith or arbitrary action (Highway Express Lines, Inc. v. Winter, 414 Pa. 340, 345, 200 A. 2d 300, 302 (1964); R. S. Noonan, Inc. v. York School District, 400 Pa. 391, 396, 162 A. 2d 623, 626 (1960); Straw v. Williamsport, 286 Pa. 41, 43, 132 A. 804, 805 (1926); American Pavement Co. v. Wagner, 139 Pa. 623, 630-31, 21 A. 160, 161 (1891)). Fifth, the requirement of competitive bidding for municipal contracts guards against

'favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts, and to secure the best work of supplies at the lowest price practicable . . .': (Yohe v. Lower Burrell, 418 Pa. 23, 28, 208 A. 2d 847, 850 (1965); Price v. Philadelphia Parking Authority, 422 Pa. 317, 332, 221 A. 2d 138, 146 (1966))." (Emphasis in original.)

What may appropriately be added to this litany is that a disappointed bidder does not have standing to sue in Pennsylvania to enjoin the award of a contract. This was enunciated in the early case of Commonwealth ex rel. Snyder v. Mitchell, 82 Pa. 343 (1876), and has been consistently followed: Pullman, Inc. v. Volpe, 337 F. Supp. 432, at 442 (E.D. Pa., 1971); Highway Express Lines, Inc. v. Winter, 414 Pa. 340 (1964); R. S. Noonan, Inc. v. York School District, 400 Pa. 391 (1960). A taxpayer, on the other hand, does have the right to seek relief against an improper award: Harris v. Philadelphia, 299 Pa. 473 (1930); Downing v. Erie City Sch. Dist., 360 Pa. 29 (1948).

No issue is raised with respect to the original three bids submitted on February 10, 1975, in which Philadelphia Letter was the nominal "low" bidder, when all bids were rejected. Section 8.8-200(2)(b) of the Home Rule Charter expressly gives to the Procurement Department the right to reject all bids, if such action is deemed in the best interest of the city. The reasons for the rejection of those early bids were fully explained by Commissioner Winter and no taint of impropriety, fraud or collusion has been claimed or demonstrated as to that decision. On February 20, 1975, the three bids presently in litigation were submitted, as previously described.

The core issue turns upon the definition of the "lowest, responsible bidder" as mandated in section 8.8-200(1) of the Home Rule Charter. Assuming, arguendo, that the bid of Smith was not the "lowest" in the pecuniary sense, a conclusion which is by no means conceded by defendants Smith and Winter nor demonstrated by the foregoing analysis, the inquiry does not terminate at that point: Commonwealth ex rel. Snyder v. Mitchell, supra, considering the phrase "lowest responsible bidder" under the Act of May 23, 1874, P.L. 230, held (at page 349) that the word "responsible" "when applied to contracts, requiring for their execution, not only pecuniary ability, but also judgment and skill, imposes, not merely a ministerial duty upon the city authorities, such as would result did their powers extend no further than to ascertain whose was the lowest bid . . . but also duties and powers which are deliberative and discretionary." See also Douglass v. Commonwealth ex rel. Senior, 108 Pa. 559 (1885); Interstate Vitrified Brick & Paving v. Phila., 164 Pa. 477 (1894).

In Kratz v. Allentown, 304 Pa. 51 (1931), it was observed at page 54:

". . . the courts have uniformly held that the question of who is the lowest responsible bidder is one for the sound discretion of the proper municipal authority, and does not necessarily mean the one whose bid on its face is lowest in dollars, but includes financial responsibility, also integrity, efficiency, industry, experience, promptness and ability to successfully carry out the particular undertaking, and that a bond will not supply the lack of these characteristics. See Wilson et al. v. New Castle City et al., 301 Pa. 358. . . . Where a full investi-

gation discloses a substantial reason which appeals to the sound discretion of the municipal authorities they may award a contract to one not in dollars the lowest bidder. The sound discretion, which is upheld, must be based upon a knowledge of the real situation gained by a careful investigation.

"The discretion, however, is in the determination of who is the lowest responsible bidder; when that is settled, discretion ends and the contract must be awarded, if at all, to him . . . regardless of the difference in the bids, whether it is more or less."

This definitional concept was incorporated in the annotation to section 8-200 of the Home Rule Charter where it was said: "[S]ince the bidder submitting the lowest bid may by experience, reputation or resources not be capable of the performance required, the lowest bidder must also be a 'responsible' bidder within the meaning of that term as established by many judicial decisions."

An awarding authority, however, may not arbitrarily disregard a low bid and award to one higher up the economic scale, to the prejudice of the taxpayers. The holding in Pearlman v. Pittsburgh, 304 Pa. 24 (1931), is, at pages 28-29: "The award of a contract *to one not prima facie the lowest bidder*, however, must rest upon a full and honest investigation of the qualifications, etc., of the respective bidders. . . . [t]hey were bound to investigate and, if a bidder measured up to the law's requirement as a responsible party, the board could not capriciously award the contract to another." (Emphasis supplied.)

Merely because a contract is awarded to one who is not the "lowest" bidder is not, in itself, sufficient to defeat a letting. The burden is upon him who seeks to set aside such an award to show that the

"lowest" bidder was the "lowest responsible" bidder and that the awarding authority abused its discretion in such rejection. The powers which an awarding authority exercises in reaching such a determination are deliberative and discretionary and in the absence of a showing of bad faith, fraud or corrupt motives, should not be the subject of judicial veto.

"Executive officers are clothed with the responsibility of originating and executing plans for the public good; the presumption is that their acts are on such considerations and their decisions reached in a legal way after an investigation. When their actions are challenged, the burden of showing to the contrary rests on those asserting it, and it is a heavy burden; courts can and will interfere only when it is made apparent this discretion has been abused." Wilson v. New Castle City, 301 Pa. 358, 365 (1930).

The instant contract is of the highest importance in the exercise by the citizenry of their most precious collective asset, the right to vote. It is not enough that the printed matter required for the primary and general election be done; it must be done accurately and timely. A delay in completion or deficient performance could jeopardize an entire electoral process; a deviation in the size of the ballot strips, not cut to assure correct alignment and insertion in the voting machine channels and registering precisely with corresponding lever positions could yield unwanted registry of votes and prejudice to candidates seeking public office. Pecuniary damages from a defaulting bidder or its surety would be inappropriate compensation for the incalculable loss to the citizenry. Any construction of the operative words "lowest responsible bidder"

in monetary terms alone "would be productive of far more evil than good": Mitchell, supra, at page 350. In that seminal case, the court continued at page 350:

". . . it is settled beyond controversy, that where the complaint is against a person or body that has a discretionary or deliberative function to exercise, and that person or body has exercised that function, according to the best of his or its judgment, the writ of mandamus will not be granted to compel the undoing of that which has been done."

The Procurement Commissioner did investigate the bid of Philadelphia Letter. He found (1) that its bid price was subject to extra charges for an item reasonably to be anticipated while no corresponding extra cost was in the Smith bid; (2) that the Philadelphia Letter plant and personnel were inadequate to fully perform the job; (3) that the amount involved for this one contract was close to the total annual dollar volume of work produced by Philadelphia Letter; (4) that Philadelphia Letter could only perform the contract by a prohibited delegation of a substantial portion of the job to another printing firm whose credit position was questionable; (5) that the prior experience of printing work performed by Philadelphia Letter for the City of Philadelphia with respect to a job requiring far less printing than the instant one was not wholly satisfactory; and (6) that the base cost differential between Philadelphia Letter's bid and that of Smith for section I of the contract was $39 and for section II of the contract was $1,173, differentials which could reasonably be expected to be totally dissipated and result in an inversion of the relative bid

positions upon the actual performance of the contract. The Procurement Commissioner's rejection of the "prima facie" lowest bidder was founded on a full and honest investigation and cannot be repudiated as an arbitrary or capricious abuse of discretion.

It is undeniable that the general instructions to bidders, included in the bid invitation, stated the requirements that each item, of which there were ten, "must be bidded individually and totalled forward to a separate lump sum." Further, "The City Commissioners shall have the right to maintain on the premises of the successful bidder such representatives as they may consider necessary at all times, from the awarding to the completing of the contract." It is equally clear that the Smith bid did not comply with these conditions in that its bid was subject to a letter wherein they conditioned their bid on an "all or none" acceptance, did not itemize the various sub-parts of the several sections and did not agree to an absolute and unqualified right of the Commissioners to have their representative present at their premises throughout the performance of the contract. Were these general instructions mandatory so as to disqualify the bid by reason of such deviations, such as would attach to the failure to supply a bid bond (Colella v. Allegheny County, 391 Pa. 103 (1958)); or the failure to execute the bid (Whitemarsh Twp. Auth. v. Finelli Bros., 408 Pa. 373 (1962)); or directory only and subject to waiver in the discretion of the Procurement Commissioner? An examination of the entire bid invitation, including the remaining general instructions as well as the conditions of bidding prompts the conclusion that these instructions did not rise to the

level of statutory or ordinance requirements, deviation from which would require the voiding of the bid.

Preliminarily, it should be observed that the absence of itemization and the conditional "all or none" submission were elements present in the Smith bid for similar election printing for the year 1974 and that bid was accepted and contract awarded. The introduction to the quoted instructions carried and clearly articulated declaration of intention "The City expects that the successful bidder will be cooperative and will consider his bid a 'package price.' " The same instruction which directed itemization of bid also carried a caveat consistent with an "all or none," or "package price" that "The City reserves the right to award any or all items according to its best interests." Paragraph 1 of the conditions of bidding explicitly reserved a discretionary power in the Procurement Commissioner: ". . . A bid which is incomplete, obscure, conditional, unbalanced, which contains additions not called for, or irregularities of any kind . . . *may* be rejected as informal." (Emphasis supplied.) All bidders were on notice of these reserved powers in the procurement Commissioner. At no point did the Smith bid vary from the specifications of the work to be performed or the materials to be supplied.

We conclude that the enumerated noncompliance with the general instructions and the reservations by this bidder did not render the Smith bid an unlawful one; rather it was one which was subject to a discretionary rejection by the Procurement Commissioner. Consistent with the needs for prompt and effective performance, in the best interest of the city as he viewed it to obtain a single

contract to provide all the printed materials required from a single supplier, even though several different contractors might have lower bids on certain separate items yielding a possible lower gross cost (see Potts v. Philadelphia, 195 Pa. 619 (1900)), the Procurement Commissioner chose not to reject the Smith bid for these deviations. Itemization of bid price might have furnished the Procurement Commissioner a more detailed basis for the analysis and comparison of the various separate item prices. However, the absence thereof is in no way evidence of fraud nor did it exclude a common standard by which to measure the competing prices in what was sought as a "package price." See Mazet v. Pittsburgh, 137 Pa. 548 (1890); Book v. Hall, 339 Pa. 470 (1940). By the absence of itemization and the "all or none" submission it made, Smith was merely indicating that if the Procurement Commissioner exercised his discretion to award on an "item by item" basis, rather than as a "package," Smith was not a bidder. The Procurement Commissioner elected to award the contract as an entirety and, for this purpose, the Smith bid was sufficient in every respect. We are foreclosed from interfering with this exercise of discretion, absent fraud or collusion, which plaintiff has conceded is not here present.

The contention that the Procurement Commissioner, in the exercise of his discretion, should have bifurcated the contract, awarding a portion to Philadelphia Letter and the balance to Allen Lane & Scott, thereby effecting a seeming savings, i.e., re "extra charge" for absentee ballots, of $19,210 less than the Smith bid, is without merit. Aside from the fact that the "saving" might ultimately be nonexistent, this assertion is predicated upon the "re-

sponsibility" of Philadelphia Letter, which the Procurement Commissioner found wanting for the reasons previously narrated. In addition, it would have yielded a division of responsibility for the performance of a sensitive contract and the commissioner in his discretion and consistent with the explicitly reserved power "to award any or all items" determined that such was not in the best interests of the city. It is not given to the court to question the wisdom of that determination or to attempt to substitute judicial discretion for administrative discretion: Weber, supra, at page 183.

## FINDINGS OF FACT

1.  Plaintiff, Gerald R. Cain, is a taxpayer of the City of Philadelphia.

2.  Otto R. Winter is the Procurement Commissioner of the City of Philadelphia.

3.  In February 1975, the City of Philadelphia, through Commissioner Winter, caused to be advertised an invitation to bid on the city's requirements for printed material needed to conduct the 1975 primary and general elections, identified as Bid 160AR.

4.  The bid specifications outlined 10 items required by the city. Items 1 through 5, intended for use in the primary election to be held May 20, 1975, consisted of the following: ballot label strips for voting machines, specimen ballots, return sheets, official absentee ballots and tally sheets. Items 6 through 10 consisted of the same items but were intended for use in the November 1975 general election.

5.  In response to the City of Philadelphia's invitation to bid, sealed bids were received on Bid

160AR from three bidders and publicly opened on February 20, 1975.

6. The three bidders who submitted bids on Bid 160AR were Philadelphia Letter Shop, Inc., Smith-Edwards-Dunlap Co. and Allen Lane & Scott.

7. Sometime prior to bid opening on February 20, 1975, representatives of the City Procurement Department, City Controller and the City Commissioners made inspections of the printing plants of two of the bidders, Allen Lane & Scott and Philadelphia Letter Shop, Inc.

8. Representatives of the City Procurement Department did not visit the facilities of Smith-Edwards-Dunlap because the Procurement Commissioner did not think it necessary to do so in view of a prior inspection of that plant, his familiarity and satisfaction with the past performance of Smith-Edwards-Dunlap and his opinion that it was adequate to perform the entire job.

9. The inspection of the plant of Allen Lane & Scott disclosed that it was adequate to perform the entire job.

10. The inspection of the plant of Philadelphia Letter Shop, Inc., disclosed that it does not have the capability in personnel or equipment to perform the entire work and, if awarded the contract, would have to subcontract a substantial portion to another printing establishment.

11. Philadelphia Letter Shop, Inc., does not have the capability in its own plant to produce bid items 1, 2, 3, 5, 6, 7, 8 or 10 of Bid 160AR.

12. The City Commissioners, the City Controller and the Procurement Department knew that Philadelphia Letter Shop, Inc., intended to subcontract those items which it could not perform in its

own plant to Lyon and Armour, Inc., of Cornwells Heights, Pa., whose plant was visited by the City Commissioners and a representative of the City Controller, only, and found adequate.

13. Prior to bid opening, plaintiff told representatives of the Procurement Department that were Philadelphia Letter Shop, Inc., to receive the award, all press work (except for bid items 4 and 9), and all camera work, wrapping, packaging, shipping and delivery would be performed by an outside subcontractor.

14. The Procurement Department personnel who visited the Philadelphia Letter Shop plant recommended to Commissioner Winter that, on the basis of the conditions and capabilities observed, the award not be given to Philadelphia Letter Shop. A written memorandum of their recommendation was subsequently given to Commissioner Winter on February 21, 1975.

15. The invitation to bid on Bid 160AR included a contract which all bidders were required to sign as part of their bid, which stated, in pertinent part:

"The contract between the parties hereto shall consist of this agreement, the 'Conditions of Bidding' and the proposal or proposal and specifications attached . . ."; and

"As this contract was executed after public advertisement and on award to the lowest responsible bidder, Seller shall not delegate the performance hereof. . . ."

16. All three bidders on Bid 160AR executed the contract which was submitted as part of their respective bids.

17. The invitation to bid on Bid 160AR contained "General Instructions to Bidder", which included, inter alia:

"The City expects that the successful bidder will be cooperative and will consider his bid a 'package price' . . .;

"Each item must be bidded individually and totalled forward to a separate lump sum for Section I-Primary 1975 and Section II-General Election 1975. The City reserves the right to award any or all items according to its best interests . . ."; and

"The adequacy of the plant, equipment, facilities and responsibility of the successful bidder will be inspected and evaluated by the Procurement Dept. and the City Commissioners and the bid award shall be subject to this evaluation."

18. The invitation to bid on Bid 160AR contained conditions of bidding which included, inter alia:

"A bid which is incomplete, obscure, conditional, unbalanced, which contains additions not called for, or irregularities of any kind . . . may be rejected as informal."

19. All three bidders on Bid 160AR bid on the exact specifications of the printed material contained in the invitation to bid.

20. Philadelphia Letter Shop, Inc., and Allen Lane & Scott submitted itemized bids for each of the enumerated items, the gross bids being the sum of the items in each of section I (primary election) and section II (general election).

21. Smith-Edwards-Dunlap bid a separate lump sum for section I-Primary 1975 and section II-General Election 1975, but failed to bid each item individually within those two sections and conditioned its bid on an "all or none" basis.

22. In a similar bid in 1974, Smith-Edwards-Dunlap had also failed to bid each item individually despite bid instructions similar to those contained

in the present invitation but it was nonetheless awarded the bid by Commissioner Winter pursuant to the same conditions of bidding as contained in Bid 160AR. That bid also was attacked by this plaintiff unsuccessfully in Gerald R. Cain, President, Philadelphia Letter Shop, Inc. v. Smith-Edwards-Dunlap Co., Court of Common Pleas, March term, 1974, no. 2908.

23. Philadelphia Letter Shop's base total bid was $287,788 plus additional charges under item No. 4 and under item No. 9 of $41.30 "per 100 any group" and $25.30 "per 100 reprints." Items No. 4 and No. 9 pertain to absentee ballots for primary and general election, respectively.

24. It was determined by Mr. Galeone, Procurement Department Buyer, that the additional charges for these items under the Philadelphia Letter Shop bid might, on the basis of past years' experience, result in additional costs as high as $4,300.

25. No precise estimate of the "extra cost" under the Philadelphia Letter Shop and Allen Lane & Scott bids for absentee ballots by reason of a third party or by reason of non-partisan absentee ballots can be determined at this time. If absentee ballots will be required for each of the 1,777 divisions at $41.30 "per 100 any group" the additional projected cost for extras under the low Philadelphia Letter Shop bid for this item would be $73,390.10 per election and substantially higher under the Allen Lane & Scott bid.

26. The bid of Smith-Edwards-Dunlap totaled $289,000 with no charge to be made for the noted additional printing as may be required under item No. 4 and item No. 9.

27. Commissioner Winter testified that, in his

opinion, omission of itemized breakdown was not grounds for rejection of the Smith bid.

28. The bid of Allen Lane & Scott was $339,858, plus additional charges of $500 "per 100 any group" and $500 "per 100 reprints" under item No. 4 and under item No. 9.

29. A suggested split of the award between Allen Lane & Scott and Philadelphia Letter Shop was rejected by Commissioner Winter because (1) Philadelphia Letter Shop was not a responsible bidder and was further disqualified because it intended to delegate performance, and (2) award of items No. 4 and No. 9 to Philadelphia Letter Shop, which it could perform in its own facilities, and the award of all other items to Allen Lane & Scott would result in a total cost to the city exceeding the bid price of $289,000 submitted by Smith.

30. Under the terms of the bid invitation, the city reserved the right to make an award of either the entire contract or individual items according to its best interest as determined by the Procurement Commissioner.

31. Commissioner Winter determined that a split award was not in the best interest of the city.

32. Commissioner Winter concluded that Philadelphia Letter Shop was not the lowest responsible bidder. In reaching this determination, he considered the intended delegation of performance, the bidder's lack of capability to perform a job of the scope and magnitude called for, and the financial standing, reputation, past performance, experience, resources and efficiency of Philadelphia Letter Shop.

33. Under all of the evidence presented, Commissioner Winter had numerous and substantial

grounds upon which to conclude that Philadelphia Letter Shop was not the lowest responsible bidder.

34. Commissioner Winter was satisfied with the past performance of Smith-Edwards in printing election materials, its financial position as reflected by Dun & Bradstreet and had no reason to believe the company incapable of satisfactory performance of this contract.

35. On February 26, 1975, Commissioner Winter determined that Smith-Edwards-Dunlap Co. was the lowest responsible bidder on Bid 160AR and that it was in the best interest of the City of Philadelphia to award Bid 160AR in its entirety to Smith-Edwards-Dunlap Co. at its total bid price of $289,000.

36. Commissioner Winter awarded Bid 160AR in its entirety to Smith-Edwards-Dunlap Co. at its total bid price of $289,000 and authorized the issuance of Notice of Award to it.

37. There is no evidence to suggest fraud, collusion, bad faith or arbitrary action on the part of any of the defendants in the award by Commissioner Winter of Bid 160AR to Smith-Edwards-Dunlap Co.

38. Under all the evidence presented, Commissioner Winter had substantial grounds upon which to conclude that Smith-Edwards-Dunlap Co. was the lowest responsible bidder.

## CONCLUSIONS OF LAW

1. Plaintiff, Gerald R. Cain, has standing as a taxpayer to bring this action.

2. In passing upon the propriety of the actions of municipal officials, judicial restraint rather than judicial intervention should guide the courts, and in the absence of improper motivation, bad faith,

fraud, collusion or arbitrary action equating an abuse of discretion, courts should not interfere with such actions.

3. The Philadelphia Home Rule Charter empowers the Procurement Commissioner to advertise and receive bids for election printing, and authorizes him, in his discretion, to reject all bids received and to readvertise in the interest of the city. In the exercise of his charter-granted powers, the commissioner has discretion to determine whether an award should be made in toto or on an item by item basis and is empowered to pass upon the responsibility of all bidders and to award a contract to the lowest responsible bidder.

4. It is to be presumed that public officers properly act for the public good, and plaintiff has not shown any evidence to rebut that presumption.

5. Plaintiff has failed to sustain his burden of proving fraud, collusion, bad faith or arbitrary action equating an abuse of discretion on the part of the Procurement Commissioner in determining that Philadelphia Letter Shop was not the lowest responsible bidder.

6. Plaintiff has failed to sustain his burden of proving fraud, collusion, bad faith or arbitrary action equating an abuse of discretion on the part of the Procurement Commissioner in determining not to consider Philadelphia Letter Shop a responsible bidder as to items No. 4 and No. 9 alone.

7. The Procurement Commissioner has the power to accept or reject "a bid which is incomplete, obscure, conditional, unbalanced, which contains additions not called for, or irregularities of any kind." Plaintiff has failed to sustain his burden of proving fraud, collusion, bad faith or arbitrary action equating an abuse of discretion on the part of

the Procurement Commissioner in determining not to reject the bid of Smith-Edwards-Dunlap Co.

8. Plaintiff has failed to sustain his burden of proving fraud, collusion, bad faith or arbitrary action equating an abuse of discretion on the part of the Procurement Commissioner in determining that Smith-Edwards-Dunlap Co. was the lowest responsible bidder.

9. Plaintiff has failed to sustain his burden of proving fraud, collusion, bad faith or arbitrary action equating an abuse of discretion on the part of the Procurement Commissioner in determining to award the bid as a whole rather than on an item by item basis.

10. Plaintiff has failed to sustain his burden of proving fraud, collusion, bad faith or arbitrary action equating an abuse of discretion on the part of the Procurement Commissioner in awarding the entire bid to Smith-Edwards-Dunlap Co.

Wherefore, we have heretofore entered the following

## DECREE NISI

And now, March 27, 1975, upon consideration of the pleadings, testimony, exhibits, briefs and argument held thereunder, it is hereby ordered and decreed that the petition for injunctive relief is denied and the complaint in equity dismissed.

The prothonotary of Philadelphia County is directed to enter this decree as a decree nisi and to give immediate notice thereof to all parties or their counsel of record, as required by the Rules of Equity. An adjudication will be filed promptly hereafter setting forth findings of fact and conclusions of law and notice given of said filing. Unless exceptions thereto are filed within 20 days after

notice of filing of said adjudication, this decree nisi shall be entered as a final decree.

This adjudication being filed April 1, 1975, and copies thereof served on all parties or their counsel, unless exceptions hereto are filed within 20 days from this date, the decree nisi shall be entered as a final decree.