American Totalisator Company, Inc., Petitioner v. Charles S. Seligman, Acting Secretary of Revenue, Commonwealth of Pennsylvania et al., Respondents. Control Data Corporation, Party Respondent.

Argued August 6, 1977, before Judge ROGERS. Argument on exceptions January 31, 1978, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., ROGERS, BLATT and DISALLE.

*Patrick W. Kittredge,* with him *David Gutin,* and *Cohen, Shapiro, Polisher, Shiekman and Cohen,* for petitioner.

*Frank A. Sinon,* with him *R. Stephen Shibla, Rhoads, Sinon & Hendershot,* and, of counsel, *W. Hubert Plummer* and *Rogers, Hoge & Hills,* for party respondent.

ADJUDICATION

American Totalisator Company, Inc. (AmTote), a Delaware corporation registered to do business in Pennsylvania, has filed a Petition for Review in this Court naming as respondents Milton Lopus, the Commonwealth's Secretary of Revenue; Charles S. Seligman, the Commonwealth's sometime Acting Secretary of Revenue; Lynn P. Nelson, the Executive Director of the Commonwealth's Bureau of State Lotteries; the Commonwealth's Department of Revenue; and its Bureau of State Lotteries, a State activity within the Department of Revenue. For reasons which will be apparent, Control Data Corporation (CDC), also a Delaware corporation, was permitted to intervene as

a party respondent. AmTote's amended petition describes events with respect to the invitation by the Bureau of State Lotteries for competitive bids for the development and implementation of a State daily numbers game which, being the subject of our findings of fact, will not here be described further than to disclose that only AmTote and CDC bid and that Acting Secretary of Revenue Seligman decided that the State should contract with CDC. AmTote's suit contests the Secretary's action as a violation of State policy and law governing the award of contracts by competitive bidding and as an abuse of the Acting Secretary's discretion in the circumstances. AmTote seeks an order setting aside the Secretary's action, restraining the original respondents from contracting with CDC, and directing the State to enter into negotiations for a contract with AmTote. Although the Secretary's decision to enter into negotiations with CDC was made June 23, 1976, the contract entered into by the State and CDC was effective October 1, 1976 and the daily numbers game began on March 1, 1977, we note that AmTote began this lawsuit on July 6, 1976 and promptly moved for a preliminary relief which we refused. AmTote is clearly innocent of laches.

The State and CDC filed preliminary objections to AmTote's Petition for Review which we dismissed by order and opinion filed December 22, 1976, and reported at *American Totalisator Company, Inc. v. Seligman*, 27 Pa. Commonwealth Ct. 639, 367 A.2d 756 (1976). The respondents sought review of this order by the Supreme Court of Pennsylvania but the prayer of their petition for allocatur was denied in April 1977. Beginning June 15, 1977, we conducted a trial on the merits which produced a substantial record. We heard arguments on August 6, 1977 and the matter is now ready for adjudication.

## Statement of the Issues

Both the petitioner and the respondents present issues for our consideration. The respondents still press the issues raised in the objections which we disposed of in December 1976 in *American Totalisator Company, Inc. v. Seligman, supra;* to wit: that Am-Tote does not have capacity to sue because it is a mere disappointed bidder; and that AmTote's amended Petition for Review does not state a cause of action because the invitation was to bid for professional services not required to be let on competitive bids. No significant new light on these subjects having been cast by the respondents since our earlier decision we need not comment further on those matters at this place. We stand on our earlier opinion.

AmTote says that we should grant it the relief requested in its amended Petition for Review because (1) the original respondents violated the law of competitive bidding by permitting CDC, after CDC learned the amount of AmTote's price proposal at a public opening, to submit a new price proposal much lower than CDC's original proposal and slightly lower than AmTote's original best price proposal; and (2) that the respondents violated a provision of the invitation by designating CDC as the successful bidder without giving AmTote an opportunity to include in its proposals an innovative suggestion made by CDC, which innovative suggestion was a principal reason for the designation of CDC as the successful bidder.

## Findings of Fact

In addition to the facts hereinbefore recited in this adjudication, we find as follows:

(1) In December 1975, the only state conducting a daily numbers game was New Jersey, whose game had been devised and was being successfully operated

by AmTote. Respondent Lynn R. Nelson, the Executive Director of the Bureau of State Lotteries, at the direction of the Acting Secretary of Revenue, instructed Conrad W. Stauffer, a Bureau deputy, to investigate and make recommendations with respect to a numbers game in Pennsylvania.

(2) In early January, 1976, Stauffer submitted his report recommending that Pennsylvania institute a daily numbers game and use outside management to operate the system. During the same month an Evaluation Committee composed of Department of Revenue and Bureau of Lotteries employes was formed to prepare a Request for Proposal and to receive and evaluate bids received in response to that proposal. During January and February 1976, the Evaluation Committee studied the matter and prepared a Request for Proposal, large parts of which were lifted from a Request for Proposal for such a game lately prepared by the State of Maryland.

(3) The Request for Proposal prepared by the Evaluation Committee and sent to prospective bidders on February 19, 1976 provided that the contract would be awarded pursuant to "laws, rules and regulations relating to award of public contracts in this State" and that "the contract [would be] awarded in conformity with the concept of the lowest responsible bidder." The covering letter sent with the Request for Proposal stated "The Pennsylvania Bureau of State Lottery invites your company to participate in a competitive bidding proposal." The Request for Proposal also provided that, although the Bureau of State Lotteries reserved the right to reject any or all proposals, bidders would be held to the terms submitted by their proposals.

(4) The Request for Proposal as originally prepared and sent contained a requirement that the

"agent keyboard operated terminals . . . have the capability of totalling and displaying an amount due from multiple purchase transactions." By an addendum, the Bureau told bidders that it was not mandatory that the keyboard terminal be equipped with a display for purposes of showing totals and subtotals from multiple purchase transactions, but that it was "highly desirable".

(5)   Both AmTote and CDC in fact proposed a display capable of showing totals and subtotals from multiple purchase transactions.   AmTote seems to have proposed a keyboard operated terminal capable of making a printed display such as might be provided by a cash register tape.   CDC offered to supply an element additional to the "keyboard operated" terminal.   This element was a cathode ray tube on which the totals and subtotals as punched on the keyboard would be displayed.

· (6)   Both AmTote's and CDC's proposal met all of the requirements of the technical part of the State's Request for Proposal; and with respect to the "highly desirable" display both proposals did what the State asked.

(7)   The Request for Proposal in its final form provided that the bidders' technical proposals—that is, the proposals for the supply of equipment and management services—would be reviewed before the cost proposals (or price to be charged by the bidders) were opened and considered.

(8)   As a means of judging the merits of the technical proposals, the Evaluation Committee decided upon eight categories for judgment, as follows: Internal Control System, Management Reports Capabilities, Terminal, Central Computer Facility, Maintenance Capabilities, Security, Training, and General Ability of Company to Perform.   Each member of

the Evaluation Committee was asked to and did grade each of the proposals with respect to each of the categories. In all the categories, except those of Terminal and Training, the members of the Committee found no significant disparity in merit between the two proposals. CDC's proposal received substantially higher grades in the category of Terminal and somewhat higher grades in Training, and these advantages resulted in CDC's having a higher total grade. CDC's terminal was preferred chiefly because it offered the cathode ray tube.

(9) A cathode ray tube was not used at agents' terminals in the New Jersey game, nor was it used in the daily numbers game as finally proposed and placed in operation in Maryland under AmTote management. Cathode ray tubes have been in use for many years and are available in the market place. Indeed, the Request for Proposal required that a cathode ray tube be supplied at the lottery's headquarters for use with other equipment, and AmTote proposed to supply such. It is clear that AmTote could have provided a cathode ray tube at the terminals if the Request for Proposal had called for such.

(10) The Evaluation Committee was impressed with CDC's terminal with the cathode ray tube because the cathode ray tube could be used in training agents operating the keyboard terminals. The Evaluation Committee was also impressed with CDC's cathode ray tube because it could display the winning number for that day. These two considerations contributed heavily to CDC's higher marks for its proposed terminal, which in turn resulted in higher marks for its overall technical proposal.

(11) A section of the Request for Proposal provided as follows:

*Innovative Suggestions and Recommendations:*
The Bureau welcomes and invites innovative
suggestions and recommendations from bidders
who feel the operation of the proposed daily
lottery can be improved. Such suggestions and
recommendations may not be substituted for,
but should be in addition to bid provisions re-
quired in this RFP. No bid will be disquali-
fied or rejected for failure to submit such sug-
gestions and recommendations. In the event
that the evaluation committee determines that
any such suggestion or recommendation is
worth further exploration, all bidders will have
an opportunity to conform their proposals in
accordance with the revised provisions.

(12) AmTote was never given an opportunity to
conform its proposal to that of CDC by offering as a
part of its terminal the cathode ray tube which the
Evaluation Committee had found to have such merit.

(13) With respect to cost to the Commonwealth
(or price to be charged by the bidders), the Request
for Proposal as originally circulated provided:

*Terms of Payment:* Price for services un-
der this RFP is to be quoted on a percentage
of the gross revenue handled by the system.
The revenue is only the actual money due from
the sale of bets or tickets. Gross revenue is
defined as the total amount wagered. No other
form of payment will be requested or accepted.

The cost must be inclusive of all services
without reference to any guaranteed minimums.
Payments will be in accordance with standard
State Operating Procedure or a method mutu-
ally agreed to by this Bureau and the con-
tractor.

(14)  As the result of a bidder's conference, the Bureau prepared and provided a matrix which might be used by the bidders in the following form:

## PAYMENT PERCENTAGE SCHEDULE

| TERMINALS ACTIVE | GROSS WEEKLY DOLLARS WAGERED | | | | | | |
|---|---|---|---|---|---|---|---|
| | $1,000,000 TO $1,499,999 | $1,500,000 TO $1,999,999 | $2,000,000 TO $2,499,999 | $2,500,000 TO $2,999,999 | $3,000,000 TO $3,499,999 | $3,500,000 TO $3,999,999 | $4,000,000 AND UP |
| 500 TO 1000 | | | | | | | |
| 1001 TO 1200 | | | | | | | |
| 1201 TO 1400 | | | | | | | |
| 1401 TO 1650 | | | | | | | |

(15) Accompanying the addendum which provided the matrix was the following instruction to bidders:

Submitted under Appendix A is a Matrix that has been evaluated by the Committee to fully accommodate both the contractor, in his effort to arrive at a reasonable cost fixation, and to accommodate the Commonwealth in its evaluation of those costs offered. Cost is not the sole consideration nor will it be the prime determining factor in the awarding of a contract. The cost portion is to be completely separated from the technical aspects, sealed in a separated envelope and either mailed within the main proposal, or sent under separate cover. The Evaluation Committee will completely review all technical matter and cost will not enter into the picture until a later designated date. Cost, however, must accompany proposal on due date. *Note:* This Matrix offered does not preclude submitting a separate bid based upon percentage of gross handle.

(16) The technical evaluation having been completed, the cost proposals were opened by the Acting Secretary of Revenue on June 2, 1976. Contrary to the wishes of the Acting Secretary of Revenue but in accordance with the advice of lawyers for the Department of Revenue, this opening was public.

(17) Each of the bidders used the matrix and each, as was understood to be necessary, placed one percentage figure in each of the twenty-eight blocks of the matrix.

(18) AmTote's cost proposal, which had been submitted with its technical proposal on March 26, 1976, was as follows:

PAYMENT PERCENTAGE SCHEDULE

| Terminals Active | GROSS WEEKLY DOLLARS WAGERED | | | | | | |
|---|---|---|---|---|---|---|---|
| | $1,000,000 to $1,499,999 | $1,500,000 to $1,999,999 | $2,000,000 to $2,499,999 | $2,500,000 to $2,999,999 | $3,000,000 to $3,499,999 | $3,500,000 to $3,999,999 | $4,000,000 And Up |
| 500 to 1000 | 9.40 | 7.91 | 6.85 | 5.85 | 5.07 | 4.60 | 4.11 |
| 1001 to 1200 | 9.53 | 8.20 | 7.07 | 6.03 | 5.25 | 4.76 | 4.30 |
| 1201 to 1400 | 9.66 | 8.50 | 7.30 | 6.22 | 5.43 | 4.92 | 4.48 |
| 1401 to 1650 | 9.79 | 8.77 | 7.50 | 6.37 | 5.61 | 5.07 | 4.67 |

Notes

A. Please see paragraph 4.1.2 regarding the above Fee Bid rates.

B. All Fee rates in the above schedule are expressed as a percentage of the gross weekly dollars wagered through the AmTote System.

(19)  CDC's cost proposal, also submitted March 26, 1976, was:

## PAYMENT PERCENTAGE SCHEDULE

| TERMINALS ACTIVE | GROSS WEEKLY DOLLARS WAGERED | | | | | | |
|---|---|---|---|---|---|---|---|
| | $1,000,000 to $1,499,999 | $1,500,000 to $1,999,999 | $2,000,000 to $2,499,999 | $2,500,000 to $2,999,999 | $3,000,000 to $3,499,999 | $3,500,000 to $3,999,999 | $4,000,000 AND UP |
| 500 to 1000 | 10.375 | 6.85 | 4.15 | 2.0 | 1.5 | 1.0 | .5 |
| 1001 to 1200 | 11.5 | 7.25 | 4.95 | 2.5 | 2.0 | 1.5 | 1.0 |
| 1201 to 1400 | 12.5 | 7.75 | 5.45 | 3.0 | 2.5 | 2.0 | 1.15 |
| 1401 to 1650 | 13.375 | 8.25 | 5.85 | 3.5 | 3.0 | 2.45 | 1.25 |

(20) The numbers appearing on each bidder's matrix set forth in findings 18 and 19 were read aloud by Acting Secretary Seligman on June 2, 1976 and each of the bidders thereby learned of the other's bid.

(21) After hearing the percentages contained in both matrices, it was obvious that CDC and AmTote had not calculated their bids on the same basis.

(22) AmTote's cost proposal was submitted on an effective rate basis.

(23) In order to determine the cost to the Commonwealth using AmTote's bid as submitted on March 26, 1976, all that need be done is to multiply the amount of gross weekly dollars wagered by the percentage figure in the particular frame of the matrix which would be applicable to that dollar amount.

(24) CDC's cost proposal was submitted on an accumulative rate basis.

(25) In order to determine the cost to the Commonwealth using CDC's bid as submitted on March 26, 1976, it is necessary to first make an assumption that the percentage figures in the first column of CDC's matrix are applicable for wagers from zero to $1,499,999. Without making such an assumption, there is no way that any one can calculate the cost to the Commonwealth using CDC's bid as first submitted because there is no way of knowing the percentage fee being charged by CDC for wagers from zero to $1,-000,000.

(26) On June 2 or June 3, 1976, at Seligman's request, two employes of the Bureau at the Secretary's direction took the cost proposals submitted by CDC and AmTote and used them to prepare a chart comparing the cost to the Commonwealth if both bids were submitted on an effective rate and if both bids were submitted on an accumulative rate. This is a copy of that chart:

AMERICAN TOTALISATOR COMPANY, INC. *
CONTROL DATA CORPORATION +

## PAYMENT PERCENTAGE SCHEDULE

### COMPARISON OF EFFECTIVE VS. ACCUMULATIVE RATES

HIGHEST DOLLAR AMOUNT IN EACH COLUMN USED TO DETERMINE TOTAL DOLLAR COST TO COMMONWEALTH

| TERMINALS ACTIVE | | 1,000,000 TO 1,499,999 | 1,500,000 TO 1,999,999 | 2,000,000 TO 2,499,999 | 2,500,000 TO 2,999,999 | 3,000,000 TO 3,499,999 | 3,500,000 TO 3,999,999 | 4,000,000 AND UP |
|---|---|---|---|---|---|---|---|---|
| **500 TO 1000** | * EFFECTIVE | 9.4 / $141,000 | 7.91 / $158,200 | 6.85 / $171,250 | 5.85 / $175,500 | 5.07 / $177,450 | 4.60 / $184,000 | 4.11 / $164,400 |
| | * ACCUMULATIVE | 141,000 | 180,350 | 214,800 | 244,050 | 269,400 | 292,400 | 292,400 |
| | + EFFECTIVE | 10.375 / 155,625 | 6.85 / 137,000 | 4.45 / 111,250 | 2.0 / 60,000 | 1.5 / 52,500 | 1.0 / 40,000 | .5 / 20,000 |
| | + ACCUMULATIVE | 155,625 | 189,875 | 212,125 | 222,125 | 229,625 | 234,625 | 234,625 |
| **1001 TO 1200** | * EFFECTIVE | 9.53 / $142,950 | 8.20 / $164,000 | 7.07 / $176,750 | 6.03 / $180,900 | 5.25 / $183,750 | 4.76 / $190,400 | 4.30 / $172,000 |
| | * ACCUMULATIVE | 142,950 | 183,950 | 219,300 | 249,450 | 275,700 | 299,500 | 299,500 |
| | + EFFECTIVE | 11.5 / 172,500 | 7.25 / 145,000 | 4.95 / 123,750 | 2.5 / 75,000 | 2.0 / 70,000 | 1.5 / 60,000 | 1.0 / 40,000 |
| | + ACCUMULATIVE | 172,500 | 208,750 | 233,500 | 246,000 | 272,250 | 279,750 | 279,750 |
| **1201 TO 1400** | * EFFECTIVE | 9.66 / $144,900 | 8.50 / $170,000 | 7.30 / $182,500 | 6.22 / $186,600 | 5.43 / $190,050 | 4.92 / $196,800 | 4.48 / $179,200 |
| | * ACCUMULATIVE | 144,900 | 187,400 | 223,900 | 255,000 | 282,150 | 306,750 | 306,750 |
| | + EFFECTIVE | 12.5 / 187,500 | 7.75 / 155,000 | 5.45 / 136,250 | 3.0 / 90,000 | 2.5 / 87,500 | 2.0 / 80,000 | 1.15 / 46,000 |
| | + ACCUMULATIVE | 187,500 | 225,250 | 253,500 | 288,500 | 281,000 | 291,000 | 291,000 |
| **1401 TO 1650** | * EFFECTIVE | 9.79 / $146,850 | 8.77 / $175,400 | 7.50 / $187,500 | 6.37 / $191,100 | 5.61 / $196,350 | 5.07 / $202,800 | 4.67 / $186,800 |
| | * ACCUMULATIVE | 146,850 | 190,700 | 228,200 | 260,050 | 288,100 | 313,450 | 313,450 |
| | + EFFECTIVE | 13.375 / 200,625 | 8.25 / 165,000 | 5.85 / 146,250 | 3.5 / 105,000 | 3.0 / 105,000 | 2.45 / 98,000 | 1.25 / 50,000 |
| | + ACCUMULATIVE | 200,625 | 241,875 | 271,125 | 288,625 | 303,625 | 315,875 | 315,875 |

(27) The authors of said chart reasonably assumed that the bids provided by CDC and AmTote were complete as submitted on March 26, 1976.

(28) When the Bureau employes calculated the cost to the Commonwealth of CDC's bid on an accumulative rate basis, they assumed that the percentages in the first vertical column of the matrix were applicable for wagers between zero and $1,499,999. If they had not made that assumption, they would have been unable to calculate the cost to the Commonwealth under CDC's bid using an accumulative rate basis.

(29) From the calculations made on or about June 3, 1976, shown on the chart at Finding 26, it is obvious that CDC's bid was submitted on an accumulative basis and not on an effective rate basis.

(30) On June 3, 1976, Seligman wrote to AmTote and CDC seeking clarification of their respective cost proposals.

(31) In his letter to AmTote, Seligman requested confirmation that the percentages in the matrix represent an effective rather than a cumulative rate. He also requested that AmTote calculate the dollar cost to the Commonwealth in each frame of the matrix. Lastly, his letter sought clarification concerning the inclusion of discounts in AmTote's bid.

(32) In his letter to CDC, as he had of AmTote, Seligman requested a dollar cost calculation for each frame of the matrix. His letter stated that the percentages in CDC's bid represent progressive, or cumulative, percentages rather than effective rates, and he asked for confirmation thereof. He also asked for a statement of the principles of cumulative rate calculation supporting the bid submitted by CDC.

(33) The only clarification Seligman sought from CDC was a confirmation that their bid was prepared on an accumulative basis.

(34) AmTote's response to Seligman's letter confirmed that the AmTote bid was predicated upon an effective rate basis. AmTote indicated that, in its opinion, an effective rate was the only responsive basis upon which fees could be bid. AmTote included a matrix with its response on which it set forth the dollar cost to the Commonwealth in each frame of the matrix. AmTote's matrix is as follows:

GROSS WEEKLY DOLLARS WAGERED

| Terminals Active | $1,499,999 | $1,999,999 | $2,499,999 | $2,999,999 | $3,499,999 | $3,999,999 | $4,499,999* |
|---|---|---|---|---|---|---|---|
| 500 to 1000 | $ 140,985 | $ 158,200 | $ 171,250 | $ 175,500 | $ 177,450 | $ 184,000 | $ 184,950 |
| 1001 to 1200 | 142,950 | 164,000 | 176,750 | 180,900 | 184,100 | 190,400 | 193,500 |
| 1201 to 1400 | 144,900 | 170,000 | 182,500 | 186,600 | 190,050 | 196,833 | 201,600 |
| 1401 to 1650 | 146,850 | 175,400 | 187,500 | 191,100 | 196,350 | 202,800 | 210,150 |

* This wagering amount is used in accordance with telephone instructions of Mr. Seligman of June 4, 1976

(35) AmTote's response to Seligman's letter did not result in any changes in the numbers set forth on AmTote's matrix as submitted on March 26, 1976.

(36) With respect to the discounts referred to in AmTote's cost proposal, AmTote's response to Seligman's letter quoted from their cost proposal in order to emphasize that the proposal states that the discounts are already included in the figures set forth on AmTote's matrix and that no further discount and no additional fees, regardless of terminal activity, would be involved if AmTote's bid was accepted.

(37) All of the numbers set forth in the matrix submitted by AmTote and shown at Finding 34 were identical to the numbers set forth on the matrix prepared by Bureau employes to calculate the cost to the Commonwealth of AmTote's bid on an effective rate basis. (Finding 26).

(38) CDC's response to Seligman's letter confirmed that CDC's pricing was on an accumulative rate basis.

(39) CDC's response to Seligman's letter included a matrix setting forth the dollar cost to the Commonwealth in each frame of the matrix. In this matrix, and in the attached covering letter, CDC stated that the percentage numbers in the first vertical column of the matrix were only to be multiplied by the dollars wagered between $1,000,000 and $1,499,999. The cost to the Commonwealth for wagers between zero and $1,000,000 was stated to be 5% of gross weekly dollars wagered. This is referred to in CDC's response to Seligman's letter as its "base cost." CDC's matrix as revised is as follows:

**PAYMENT PERCENTAGE SCHEDULE**

| TERMINALS ACTIVE | GROSS WEEKLY DOLLARS WAGERED | | | | | | |
|---|---|---|---|---|---|---|---|
| | $1,000,000 to $1,499,999 | $1,500,000 to $1,999,999 | $2,000,000 to $2,499,999 | $2,500,000 to $2,999,999 | $3,000,000 to $3,499,999 | $3,500,000 to $3,999,999 | $4,000,000 to $5,000,000 |
| INCREMENTAL 500 to 1000 | $51,875 (10.375%) | $34,250 (6.85%) | $22,250 (4.45%) | $10,000 (2.0%) | $7,500 (1.5%) | $5,000 (1.0%) | $5,000 (.5%) |
| Effective Aggregate % | 6.80% | 6.80% | 6.34% | 5.61% | 5.03% | 4.52% | 3.72% |
| AGGREGATE | $101,875 | $136,125 | $158,375 | $168,375 | $175,875 | $180,875 | $185,875 |
| INCREMENTAL 1001 to 1200 | $57,500 (11.5%) | $36,250 (7.25%) | $24,750 (4.95%) | $12,500 (2.5%) | $10,000 (2.0%) | $7,500 (1.5%) | $10,000 (1.0%) |
| Effective Aggregate % | 7.17% | 7.17% | 6.74% | 6.03% | 5.46% | 4.96% | 4.17% |
| AGGREGATE | $107,500 | $143,750 | $168,500 | $181,000 | $191,000 | $198,500 | $208,500 |
| INCREMENTAL 1201 to 1400 | $62,500 (12.5%) | $38,750 (7.75%) | $27,250 (5.45%) | $15,000 (3.0%) | $12,500 (2.5%) | $10,000 (2.0%) | $11,500 (1.15%) |
| Effective Aggregate % | 7.50% | 7.50% | 7.14% | 6.45% | 5.88% | 5.40% | 4.55% |
| AGGREGATE | $112,500 | $151,250 | $178,500 | $193,500 | $205,000 | $216,000 | $227,500 |
| INCREMENTAL 1401 to 1650 | $66,875 (13.375%) | $41,250 (8.25%) | $29,250 (5.85%) | $17,500 (3.5%) | $15,000 (3.0%) | $12,250 (2.45%) | $12,500 (1.25%) |
| Effective Aggregate % | 7.80% | 7.80% | 7.49% | 6.82% | 6.28% | 5.80% | 4.89% |
| AGGREGATE | $116,875 | $158,125 | $187,375 | $204,875 | $219,875 | $232,125 | $244,625 |

(40) The 5% figure set forth in CDC's response to Seligman's letter was an addition to the numbers set forth in the cost proposal submitted March 26, 1976.

(41) The cost proposal submitted by CDC on March 26, 1976 did not include any reference to a "base cost of 5%" for wagers between zero and $1,000,000.

(42) At the time that CDC submitted its cost proposal to the Commonwealth, it knew that the Commonwealth would be unable to calculate the cost of operating the daily numbers game under its proposal because there was no reference therein to the charge to be made for wagers between zero and $1,000,000. This rather astounding fact was testified to by CDC's bidding officer.

(43) CDC's cost proposal, as submitted on March 26, 1977, did not reveal in its narrative sections or as a footnote to its matrix, that the percentage figures in the first vertical column of its matrix were intended to apply only to wagers between $1,000,000 and $1,499,999.

(44) At the time CDC submitted its cost proposal it knew that its cost proposal was incomplete and would require the Commonwealth to ask for some sort of clarification after all bids were opened.

(45) CDC first disclosed the existence of a "base cost of 5%" for wagers between zero and $1,000,000 after learning all of the percentages contained in AmTote's matrix.

(46) The application of a "base cost of 5%" to each frame of CDC's matrix changed CDC's bid.

(47) AmTote was never told that CDC had added a 5% figure to its cost proposal.

(48) AmTote was never given an opportunity to rebid its cost proposal in light of the change of CDC's bid.

(49) A comparison of the calculations prepared by Bureau employes (Finding 26) before receiving CDC's response to Seligman's letter with the calculations set forth on CDC's matrix attached to its June 7, 1976 letter (Finding 39) shows that the application of a base cost of 5% reduced the cost to the Commonwealth in every frame of CDC's matrix by at least $53,750 per week (or $2,795,000.00 per year) and, in some frames, by as much as $83,750 per week (or $4,-355,000.00 per year).

(50) The calculations prepared by Bureau employes (Finding 26) before either bidder responded to Seligman's letters indicated that (1) if AmTote bid on an effective rate basis and CDC bid on a cumulative basis, and (2) both bids as submitted on March 26, 1976 were complete and responsive to the RFP, Am-Tote's bid was lower than CDC's in every frame of the matrix.

(51) After receiving the bidders' responses to Seligman's letters, and giving effect to the 5% base cost referred to in CDC's letters, a comparison of the two cost proposals showed that the cost to the Commonwealth of CDC's proposal was less than the cost to the Commonwealth of AmTote's proposal in the majority of the frames of the matrix.

(52) By direction of their superiors, the Evaluation Committee submitted a final report on June 17, 1976.

(53) The cost evaluation portion of the final report states that the proposals were evaluated using the clarifications submitted by both bidders in response to Seligman's June 3, 1976 letters.

(54) In evaluating CDC's cost proposal, the Evaluation Committee used the ''base cost of 5%'' for the first million dollars wagered in order to arrive at a total cost to the Commonwealth under CDC's bid.

(55)  The cost evaluations were analyzed based on sales expectations projected by the Evaluation Committee.  An explanation of the cost analysis and a cost comparison chart were attached to the final report as exhibits.  They are attached here:

COST ANALYSIS AND COMPARISONS

| (1) MONTH | (2) AVERAGE $ PER MACHINE | (3) AVERAGE # OF MACHINES | (4) GROSS $ SALES PER WEEK | (5) # OF WKS. PER MO. | (6) GROSS $ SALES PER MONTH | (7) COST OF SERVICE PER MONTH — AM. TOTE % | (7) $ COST | (8) COST OF SERVICE PER MONTH — C.D.C. % | (8) $ COST |
|---|---|---|---|---|---|---|---|---|---|
| 1 | $2,000 | 500 | $1,000,000 | 4 | $4,000,000 | 9.40 | $376,000 | 5.00 | $200,000 |
| 2 | 2,100 | 600 | 1,260,000 | 4 | 5,040,000 | 9.40 | 473,760 | 6.11 | 307,930 |
| 3 | 2,200 | 700 | 1,540,000 | 5 | 7,700,000 | 7.91 | 609,070 | 6.79 | 523,075 |
| 4 | 2,300 | 800 | 1,840,000 | 4 | 7,360,000 | 7.91 | 582,176 | 6.90 | 500,652 |
| 5 | 2,400 | 900 | 2,160,000 | 5 | 8,640,000 | 6.85 | 591,840 | 6.63 | 572,950 |
| 6 | 2,500 | 1,000 | 2,500,000 | 4 | 12,500,000 | 5.85 | 731,250 | 6.34 | 791,875 |
| 7 | 2,550 | 1,000 | 2,550,000 | 4 | 10,200,000 | 5.85 | 596,700 | 6.25 | 637,500 |
| 8 | 2,600 | 1,000 | 2,600,000 | 5 | 13,000,000 | 5.85 | 760,500 | 6.17 | 801,875 |
| 9 | 2,650 | 1,000 | 2,650,000 | 4 | 10,600,000 | 5.85 | 620,100 | 6.09 | 645,500 |
| 10 | 2,700 | 1,000 | 2,700,000 | 4 | 10,800,000 | 5.85 | 631,800 | 6.01 | 649,500 |
| 11 | 2,750 | 1,000 | 2,750,000 | 5 | 13,750,000 | 5.85 | 804,375 | 5.94 | 816,875 |
| 12 | 2,750 | 1,050 | 2,750,000 | 4 | 11,000,000 | 6.03 | 643,500 | 5.94 | 653,500 |
| 13 | 2,750 | 1,050 | 2,887,500 | 4 | 11,550,000 | 6.03 | 696,465 | 5.75 | 664,500 |
| 14 | 2,750 | 1,100 | 3,025,000 | 4 | 11,550,000 | 6.03 | 696,465 | 5.75 | 654,500 |
| 15 | 2,750 | 1,100 | 2,915,000 | 5 | 15,125,000 | 5.25 | 794,062 | 5.58 | 843,750 |
| 16 | 2,650 | 1,150 | 2,990,000 | 4 | 11,660,000 | 5.72 | 703,093 | 5.72 | 666,700 |
| 17 | 2,600 | 1,150 | 2,932,500 | 5 | 14,950,000 | 6.03 | 901,485 | 5.62 | 840,875 |
| 18 | 2,550 | 1,200 | 3,000,000 | 4 | 11,730,000 | 6.03 | 707,319 | 5.70 | 668,100 |
| 19 | 2,500 | 1,200 | 3,000,000 | 4 | 15,000,000 | 5.25 | 630,000 | 5.61 | 673,500 |
| 20 | 2,500 | 1,200 | 3,000,000 | 5 | 12,000,000 | 5.25 | 787,500 | 5.61 | 841,875 |
| 21 | 2,500 | 1,200 | 3,000,000 | 4 | 12,000,000 | 5.25 | 630,000 | 5.61 | 673,500 |
| 22 | 2,500 | 1,200 | 3,000,000 | 4 | 15,000,000 | 5.25 | 630,000 | 5.61 | 673,500 |
| 23 | 2,500 | 1,200 | 3,000,000 | 5 | 12,000,000 | 5.25 | 787,500 | 5.61 | 842,875 |
| 24 | 2,500 | 1,200 | 3,000,000 | 4 | 12,000,000 | 5.25 | 630,000 | 5.61 | 673,560 |
| TOTAL | | | | | $269,155,000 | 5.95 | 16,014,965 | 5.88 | 15,827,415 |

### Explanation of Cost
### Analysis and Comparisons Chart .

*Column 1*

The contract period as required by the R.F.P. is for a two (2) year period, excluding the 5-month initial period devoted to installation of terminals and all related hardware, software and training, which is not attendant to cost, and is shown for monthly breakdown.

*Column 2*

The figures in this column are expected average gross dollar business in sales of the daily numbers tickets per machine per week. Those figures are estimates established by the Committee and are more fully explained in the attached report.

*Column 3*

The average number of machines in operation during a week as estimated by the Committee. This column is also more fully explained in the attached memo.

*Column 4*

Derived at by multiplying Column 2 (Average dollars per machine) times Column 3 (Average number of Machines) to arrive at the estimated gross dollars in sales per week for the Daily Numbers Game.

*Column 5*

For the purposes of this chart, the expected operational contract period was used, i.e. January, 1977, thru December, 1978.

*Column 6*

The gross dollar sales per month is arrived at by multiplying Column 4 (gross dollar sales per week) times Column 5 (number of weeks per month).

*Column 7*

The cost of service per month for the American Totalisator Company is derived by using the Payment

Percentage Schedule contained in the cost portion of the American Totalisator bid and confirmed by their subsequent clarification letter of June 7, 1976. The average number of machines in Column 3 on the chart determines the *row* used on the Payment Percentages Schedule. The gross dollar sales per week in Column 4 on the chart determines the *column* used on the Payment Percentage Schedule.

*Example*

Chart Shows:

Month 5-900 machines = gross sales of $2,160,000

Schedule Shows:

Row 1, 500 to 1,000 machines and Column 3, 2,000,000 to 2,499,999 shows a per cent due of 6.85%

This percentage on the schedule is also reflected under the % Column 7. By multiplying 6.85% times the gross dollar sales per month in Column 6 (of $8, 640,000) yields a cost of service of $591,840 for month 5.

*Column 8*

The cost of service per month for Control Data Corporation is derived by using the payment percentage schedule as clarified by Control Data Corporation's letter dated June 7, 1976. The average number of machines in Column 3 on the chart determines the *row* used on the Payment Percentage Schedule. The gross dollar sales per week in Column 4 on the chart determines the *column* used on the Payment Percentage Schedule.

*Example*

Chart Shows:

Month 5-900 machines = gross sales of $2,160,000

Schedule Shows:

Row 1, 500 to 1,000 machines and Column 3, 2,000,000 to 2,499,999 shows a per cent due of (4.45% from 2,000,000 to 2,499,999).

In addition, according to the clarification letter, a 5%base cost must be added for the first $1,000,000. Because this is an add-on type scale, an additional 10.-375% must be added for the $1,000,000 thru 1,499,999 and 6.85% for the $1,500,000 thru 1,999,999.

THUS:                                  (Rounded to nearest dollar)

| | | |
|---|---|---|
| First $1,000,000 @ 5% | = | $ 50,000. |
| From 1,000,000 to 1,499,999 or 499,999 @ 10.375% = | | 51,875. |
| From 1,500,000 to 1,999,999 or 499,999 @ 6.85 % = | | 34,250. |
| From 2,000,000 to 2,160,000 or 160,000 @ 4.45 % = | | 7,120. |

| | |
|---|---|
| Cost per week | 143,245. |
| No. of weeks | X 4 |
| Cost per month | $572,980. |

In order to arrive at the individual percentage for the monthly dollar cost (as shown in Column 8 under %) the dollar cost per month is divided by Column 6, (gross dollar sales per month) and rounded to two decimal places.

THUS:

| Cost per month | | Gross Sales per month % |
|---|---|---|
| $572,980 | ÷ | 8,640,000 = 6.631713 or 6.63% |

(56) As the cost analysis and cost comparison chart show, the Evaluation Committee, by using CDC's bid as revised in response to the Acting Secretary's request for clarification, concluded that CDC's bid was lower and more favorable to the Commonwealth than AmTote's. It recommended that CDC be given the contract not only because it preferred CDC's terminal equipment, including as it did the cathode ray tube, but also because in its view CDC's revised cost bid was lower than AmTote's.

(57) The Acting Secretary of Revenue in awarding CDC the right to be the contracting party for the daily numbers game relied on the Evaluation Committee's recommendation with respect both to the technical and the cost proposals; and in connection with the cost proposals, he considered and used as a factor favorable to CDC the Evaluation Committee's and his own conclusion, based on CDC's revision, that CDC's bid was lower.

(58) As shown by a comparison of CDC's matrix as first submitted (Finding No. 19) with its revised matrix (Finding No. 39), CDC in its revised matrix by introducing for the first time a cost of five percent of gross amount wagered on amounts less than $1 million dollars, produced new percentages in every block of the first verticle column of its matrix: 10.-375% became 6.80%; 11.5% became 7.71%; 12.5% became 7.50%; and 13.375% became 7.80%.

(59) The Pennsylvania Lottery was designed to provide funds for senior citizens' programs and programs for the disabled, namely, the Property Tax and Rent Rebate programs and the Free Urban Transit Rides program.

(60) The Lottery Fund borrowed money from the General Fund in late 1971, for administrative start-up expenses. This money was repaid and the Lottery has not borrowed from the General Fund since.

(61) In addition to paying back the $1 million loan from the General Fund, the Lottery transferred $23 million, which had accumulated in Lottery profits, to the General Fund prior to the start-up of the senior citizens' programs.

(62) The excess of $23 million over the initial $1 million loan was never returned from the General Fund to the Lottery and this money was never used to fund senior citizens' programs.

(63) Each year in which anticipation of Lottery profits was authorized, money was advanced by the General Fund to the senior citizens and disabled persons programs.

(64) Each year in which anticipation of Lottery profits was authorized, the money advanced to the senior citizens' programs was returned to the General Fund later in that same year.

(65) To date, the Daily Numbers Game has averaged $2.6 million per week in sales and $800,000 per week of profits for the senior citizens' programs mandated by the General Assembly.

## Discussion

The Bureau of Lotteries' Request for Proposal for its daily numbers game, issued at the direction of the Acting Secretary of Revenue, represented that the contract for the work would be "awarded in conformity with the concept of the lowest responsible bidder" and invited the trade to "participate in a competitive bidding proposal." It thereby became obliged not only to award the work to the lowest responsible bidder[1], but to conduct the bidding process so that the public should have the advantage of fair and just competition among bidders, devoid of favoritism or fraud. The Supreme Court early declared that "true intent [where contracts are to be awarded to the lowest responsible bidder] is to secure . . . the benefit and advantage of fair and just competition between bidders, and at the same time close, as far as possible, every avenue to favoritism and fraud in its varied forms." *Mazet v. Pittsburgh,* 137 Pa. 548, 561, 20 A. 693, 697 (1890). This language has become a standard of the law, approved repeatedly by the

---

[1] *Sullivan v. Grosscup,* 42 Dauphin 323 (1936).

Supreme Court and, of course, used by lower courts. *Yohe v. Lower Burrell,* 418 Pa. 23, 208 A.2d 847 (1965); *Corcoran v. Philadelphia,* 363 Pa. 606, 70 A. 2d 621 (1950); *Dolan v. Schoen,* 261 Pa. 11, 104 A. 149 (1918); *Carroll v. Philadelphia,* 183 Pa. 55, 38 A. 1102 (1897); *Allied Paint Mfg. Co., Inc. v. Bradley,* 21 D. & C. 2d 747 (C.P. Dauphin Co., Commonwealth Dkt. 1960); *Bailey v. Gordon,* 67 D. & C. 411 (C.P. Dauphin Co., Commonwealth Dkt. 1948). The requirement in competitive bidding that there be fair and just competition and an absence of favoritism is violated whenever the bidders are treated otherwise than by a common standard. *Page v. King,* 285 Pa. 153, 131 A. 707 (1926). This is so because the representation by the public that a bid will be let to the lowest bidder implies that a common standard will apply throughout the process. Common specifications are obviously required; but so also are common treatment of bidders in the bidding process (*Louchheim v. Philadelphia,* 218 Pa. 100, 66 A. 1121 (1907)) and an award of a contract which conforms to the specifications on which the bids are taken (*Guthrie v. Armstrong,* 303 Pa. 11, 154 A. 33 (1931)).

AmTote says that the Bureau and the Acting Secretary of Revenue, in the cost bidding, disregarded its promise that the contract would be awarded to the lowest responsible bidder on principles of competitive bidding by failing to conduct open bidding, by practicing favoritism of CDC and by failing to adhere to a common standard of treatment of the bidders. After a careful consideration of the complex facts and circumstances of the cost bidding, we are satisfied that the Bureau and the Acting Secretary permitted CDC, after CDC knew the amount of AmTote's cost bid, to substitute for its, CDC's, first cost bid, which was higher than AmTote's bid, a new, different and

lower cost bid; that they permitted this without informing AmTote of their actions and without affording AmTote the same opportunity to revise its bid; and that they used the fact that CDC's second, different and lower cost bid was more favorable than AmTote's only cost bid as a basis for awarding the contract to CDC. We agree with AmTote and conclude that we are required to vindicate the law by the decree hereinafter made.

Although the facts of the case are set forth in great detail in our Findings of Fact, we believe that it is appropriate to repeat them here in less detail and in cursive fashion: The Bureau of Lotteries sent a Request for Proposal for a daily numbers game to a number of companies, including AmTote and CDC, which two companies, as it happened, were finally the only bidders. The bidding was divided into two parts: technical, which had to do with the proposed equipment and methods of operation, and cost, meaning the cost to the Commonwealth, or the price of the bidder for the use of the bidder's equipment and the managerial services over the life of the contract. The technical proposals were to be opened first, and the cost proposals later. The bids were submitted in late March 1976, the technical proposals were opened and an Evaluation Committee of Bureau and Department of Revenue officials concluded that they liked CDC's proposal better. The principal reason for the Committee's preference was the offer of CDC to supply a cathode ray tube as an element of the terminals to be provided at the sales stations around the State. The cathode ray tubes were offered by CDC as its means of displaying totals and subtotals of multiple purchases, a capability which was not required by the Request for Proposal but which was suggested as something being "highly desirable." AmTote also of-

fered a means of display of totals and subtotals of multiple purchase transactions, but not by cathode ray tube as an element of the terminal.

The crucial events, and those which principally impel us to provide the relief hereinafter ordered, occurred upon the opening of the cost proposals of the two bidders on June 2, 1976. Before that date there had been a bidders' conference from which emanated a bidding matrix prepared by an official of the Bureau of State Lotteries. This is to be found at our Finding of Fact No. 14. Although the matrix was not required to be used since the amended Request for Proposal permitted a separate bid based upon percentage of gross handle, each AmTote and CDC used the matrix. As required in using the matrix, each AmTote's and CDC's matrix, as submitted, contained one percentage figure in each of the 28 blocks. AmTote's is at Finding of Fact No. 18, and CDC's is at Finding of Fact No. 19.

As will be observed by examining the matrix, it consists of seven vertical columns containing figures representing ascending (to the right) amounts of "gross weekly dollars wagered" and four horizontal columns representing numbers of active terminals. The bidders were to write a percentage in each block.

To the unsophisticated it would appear that the cost to the Commonwealth for any one of the conditions with respect to number of terminals (horizontal columns) and gross weekly dollars wagered (vertical columns) would be the product of multiplying the appropriate actual gross weekly dollars wagered by the percentage in block at the intersection of amount wagered and number of terminals active. This is the way AmTote bid and it is called throughout these proceedings the effective rate method.

CDC decided to bid on what has been called in these proceedings the accumulative method. This method, briefly described, requires one wanting to know the amount of the bid on any combination of amount wagered and terminals active to: find the appropriate block; multiply the amount by which the gross weekly dollars wagered exceeds the lower amount in the vertical column by the percentage in the appropriate block; to repeat this calculation in each block in the same horizontal column to the left of the appropriate block; and finally to add the products of these calculations. Since the first vertical column for gross weekly dollars wagered begins not at zero but at $1,000,000, CDC's bid could not be calculated with respect to any of the 28 blocks without making the assumption that the percentage figures appearing in the "$1,000,000 to $1,499,999" column were meant to apply to wagering in any amount less than $1,499,999. Alfred Bandierini who as general manager of automated wagering for CDC was the person responsible for the submission of CDC's proposal testified that the cost to the Commonwealth of the CDC proposal could not be calculated for any block on its matrix, that he knew this when he submitted the bid, and that the bid was submitted on the assumption that the Commonwealth would ask for clarification after the bids were opened.

AmTote's bid made on the effective rate basis as herein described could be calculated in all except the four blocks in the first vertical column without assuming anything.

As noted, CDC's bid on the accumulated basis in all of the blocks, and AmTote's bid with respect to the four blocks in the lefthand column, could be calculated by assuming that the percentages appearing in the matrices in the first vertical column were meant to

apply to all amounts of wagering from zero to $1,-499,999. This in our judgment was a reasonable assumption to be made and it is exactly the assumption that the Evaluation Committee made when it reviewed the cost bids. The product of that review is the chart at Finding of Fact No. 26. Instead of simply standing on this assumption, the Acting Secretary wrote letters to each of the bidders asking for what he now calls "clarification." He told CDC that the percentages in its cost bid matrix presumably represented "progressive percentages" and asked for a calculation in each of the 28 blocks. The Acting Secretary also asked AmTote to confirm that its bid was on the effective rate basis and to put dollar figures in each block of the matrix. The Acting Secretary also asked AmTote to say what AmTote meant by the statement appended to its matrix that certain discounts were included in its bid.[2]

AmTote responded that it had bid on the effective rate basis, and repeated what it had said in its proposal—that the discounts were included. It put the numbers in each of the blocks of its matrix, which numbers were exactly those which the Evaluation Committee had recorded for AmTote's bid.

---

[2] Although AmTote's proposal said that its rates "already include" certain discounts, the Acting Secretary and other Bureau witnesses said that they had been uncertain whether those discounts were or were not already included. The Chancellor confesses to a similar uncertainty upon first reading the proposal. At the trial John A. DeVries, the Chairman of the Board of AmTote, described with great ease and clarity how the discounts had in fact been applied to and were therefore already included in, the percentages in the matrix. In view of the facts that the Acting Secretary is a certified public accountant with vast experience and that the Executive Director of the Bureau of Lotteries is a long-term employee of the Commonwealth with tax and accounting experience, their bemusement over AmTote's discounts seems to us to be somewhat remarkable.

CDC's response to the Acting Secretary's request and the Acting Secretary's and the Bureau's conduct thereafter are crucial. In addition to submitting the matrix which appears in our Finding of Fact 39, it wrote a letter containing the following paragraph:

In our *original pricing proposal* and the enclosed conversions of that pricing to an aggregate format we have accumulated the incremental percentages. In the attached matrix those percentages are expressed in terms of dollar costs for the highest gross dollar wager figure at the head of each column. For example, in the top frame of column No. 4, 2.0% of the $500,000 increment, that is from $2,500,000 to $2,999,999, or $10,000, has been added to the aggregate cost of column No. 3 to obtain a total aggregate cost of $168,375 for a gross wagering volume of $2,999,999. In order to convert this aggregate cost to a percentage revenue of gross revenue the cost is divided by the gross revenue. The result of this calculation as reflected on our chart is 5.61%. *In respect to the top frame in Column No. 1, 10.375% of the $500,000 increment has been added to our base cost of 5% on the first $1,000,000 of weekly gross wagers to obtain an aggregate cost of $1,499,999 weekly gross wagering of $101,875. This cost reflects an effective percentage on gross revenue of 6.80%.* (Emphasis supplied.)

As is apparent, CDC introduced for the first time a "base cost of five percent on the first $1 million dollars" which in turn produced in the first vertical column of the matrix something called an "effective percentage on gross revenue." The percentage figures in the first vertical column of CDC's matrix first submitted by CDC were, descending, 10.375%, 11.5%,

12.5% and 13.375%. The "effective percentages" or "effective aggregates" corresponding became 6.-80%, 7.17%, 7.50% and 7.80% as our Finding of Fact No. 58 demonstrates. The effect of those new elements of a five percent base cost and an effective aggregate in the first vertical column was to provide in each of the 28 blocks of CDC's matrix a dollar figure less than the amount computed for CDC's bid by the Evaluation Committee on the reasonable assumption that the percentages in the first vertical column in both bids would apply to all amounts from zero to $1,499,999.

Some other points may be made. The Deputy Director of the Bureau of State Lotteries testified that he simply made a mistake in not providing zero for the starting figure in the lefthand vertical column, that the reason for the mistake was an assumption that there would never be less than $1,000,000 of gross weekly wagering. We have deliberately not made this testimony the subject of a finding of fact. As the cost analysis chart which appears at Finding of Fact No. 55 demonstrates, the Bureau believed before any award was made that $269,000,000 would be grossed by the daily numbers lottery over the two years of the proposed contract. As appears by the same document, the Bureau was willing to pay about $16,000,000 to a successful bidder. We are not satisfied that the lapse which enabled CDC on a second try to be the low bidder by less than $200,000 on a contract of this magnitude was so simple a mistake and we would not be comfortable in so finding.

Another circumstance is disturbing. As we have noted, CDC's bidding representative says he knew that CDC's bid could not be translated to dollars in any block but that he nevertheless submitted the bid on the assumption that clarification would be neces-

sary. We would have great difficulty answering affirmatively whether a company bidding against others for a contract of this magnitude would submit an admittedly inscrutable bid on a mere assumption. We further note in this regard that the addendum to the Request for Proposal which accompanied the matrix contains the notation "any questions arising from this addendum please contact": followed by the name and address of the Deputy Executive Director of the Bureau. CDC made no inquiry.

Further, it should be made clear here that each of the bidders knew the others' cost proposal because they were opened publicly on June 2, 1976. AmTote's response did not change its bid. CDC's did and we emphasize that AmTote did not know this until after the Acting Secretary declared CDC to be the successful bidder.

Finally, we note that it is conceded that AmTote was a responsible bidder and that its proposal complied in all respects with the specifications and that it offered the optional "highly desirable" capability of displaying totals and subtotals of multiple purchases.

Our conclusion that the Acting Secretary and the Bureau failed to observe and indeed violated the legal requirement that competitive bidding must be conducted openly, fairly and without favoritism is compelled by the case law of Pennsylvania. *Louchheim v. Philadelphia*, 218 Pa. 100, 66 A. 1121 (1907), is very close on the facts. There the Director of Public Works of Philadelphia advertised for bids for the furnishing of filtering materials and collectors. The three lowest bidders were identified by the Director. The lowest bidder withdrew with the consent of the City, leaving as the new lowest bidder Louchheim at $328,-194.48. The third original bidder was Norcross &

Edmunds at $336,489.42. After some negotiations between the Director and Norcross & Edmunds that company's original bid was modified, and the contract was awarded to them for a sum amounting on the estimate of materials to be furnished to $302,936.33. The bid when thus reduced was lower than that of Louchheim. The Supreme Court reversed the action of the Court of Common Pleas dissolving a special injunction granted at Louchheim's suit. We deem it appropriate to quote somewhat extensively from the Supreme Court's opinion:

> The learned counsel for appellants contend that under these facts there was no such open competitive bidding when the award was made as is required by the act of assembly, and the municipal ordinances. . . . It is perfectly clear that the legislative and municipal intent in the awarding of such contracts was that there should be open and honest competition in order that fair prices should be secured and the city protected from collusive bidding as well as favorite bidders. This rule was announced in Mazet v. Pittsburgh, 137 Pa. 548, in which Mr. Justice Sterrett, who delivered the opinion of the court, said 'It cannot be doubted that the true intent of the act of 1874, and the ordinances passed in pursuance thereof, regulating the awarding of public contracts, is to secure to the city the benefit and advantage of fair and just competition between bidders, and at the same time close, as far as possible, every avenue to favoritism and fraud in its varied forms.' This is a wise and wholesome rule which should always prevail in the letting of such contracts. In the present case the contract, it is true, was awarded at a sum below the lowest bidder in the

open competition, but it was so clearly the result of private negotiations between the director and the successful contracting firm, without regard to the conditions of the open competitive bidding and the requirements of the act of assembly and the municipal ordinances, that the award cannot be sustained without striking down all those safeguards which the legislature, the courts and the city have thrown around the letting of these contracts. If the director had the power to enter into private negotiations with a contracting firm for the purpose of reducing its original bid submitted at the time of the open competition, it would necessarily follow that he would have the same power to allow the bidder to increase the amount of his bid submitted at the public letting. If such a rule is to be established it must be held to work both ways, and this would lead to favoritism and fraud in its varied forms which the courts have said must not be allowed. It is obvious that such a rule would lead to a disregard of those wholesome limitations which the legislature and the courts have imposed on the awarding of contracts under the act of 1874, and would submit this whole question to the discretion of the director. We do not doubt that the director in this instance acted in entire good faith, and did what he believed to be for the best interests of the city, but the question involved is not one of good faith on the part of the head of the department, but of power in that official in the exercise of his discretion to disregard the plain mandate of the law. There was only one safe rule to follow in this case, and that was to observe the requirements of

the statutes and the ordinances regulating the awarding of the contract. Private negotiations between a director and a successful bidder through which the terms and conditions of the competitive bids are modified or changed, resulting either to the advantage or disadvantage of the city, are not within the spirit and purpose of the law. The proper method for the director to have pursued, if convinced that the best interests of the city demanded it, was to set aside all of the bids, readvertise and secure another open competitive bidding when all of the bidders would have been on an exact equality. We, therefore, hold that the contract was not awarded according to law and sustain this bill for that reason.

In deciding that the contract was improvidently awarded, it must not be understood to indicate that it should have been awarded to any other bidder, for clearly, the director had the power, if the facts warranted it, to set aside all bids, but this question is not before us, and we express no opinion on it.

This view of the law being conclusive of the controlling question raised by this appeal, it is unnecessary to discuss other assignments of error.

The following cases represent applications of the Louchheim holding and its principles to activities of public officers demonstrating favoritism toward particular bidders: *McIntosh Road Materials Co. v. Woolworth*, 365 Pa. 190, 74 A.2d 384 (1950); *Lehigh Coal & Navigation Co. v. Summit Hill School District*, 289 Pa. 75, 137 A. 140 (1927); *Harris v. Philadelphia*, 283 Pa. 496, 129 A. 460 (1925). In *McIntosh* and *Harris* the favored bidders had been permitted to cure

technical deficiencies in their bid. In *Lehigh Coal & Navigation Co.*, the low bidder, after the award, was relieved of obligations contained in the form of contract on which the bidding was conducted. In each case an award to the favored bidders was voided. The favor accorded CDC in this case presents a more compelling reason for striking down the award than the preferences granted the favored bidders in all of the cases cited, except *Louchheim*. Here the favored bidder by private correspondence was simply permitted to reduce its bid. This was no technicality.

We are, of course, familiar with the principles which the Commonwealth and CDC urge on us concerning the latitude of the discretion enjoyed by public officials, the significance, or lack of significance, of the amount of cost bids in determining the lowest responsible bidder, the necessity of the proof of fraud where discretionary actions of public officials are questioned and the presumption of regularity of the actions of public officials. These principles are stated and some of the cases supporting them are collected in *Weber v. Philadelphia*, 437 Pa. 179, 183, 262 A.2d 297, 299 (1970).

In this area of the law, certain principles are well settled and stem, in large measure, from judicial respect for the doctrine of separation of powers in government. First, it is to be presumed that municipal officers properly act for the public good (Robinson v. Philadelphia, 400 Pa. 80, 86, 161 A.2d 1, 5 (1960); Hyam v. Upper Montgomery Joint Authority, 399 Pa. 446, 457 160 A.2d 539, 545 (1960)). Second, courts will not sit in review of municipal actions involving discretion, in the absence of proof of fraud, collusion, bad faith or arbitrary action equating an abuse of discre-

tion (Blumenschein v. Pittsburgh Housing Authority, 379 Pa. 566, 572, 109 A.2d 331, 334-35 (1954); Hyam, supra, 399 Pa. at 457, 160 A.2d at 545). Third, on judicial review, courts, absent proof of fraud, collusion, bad faith or abuse of power, do not inquire into the *wisdom* of municipal actions and *judicial* discretion should not be substituted for *administrative* discretion (Goodman Appeal, 425 Pa. 23, 30, 227 A. 2d 816, 820 (1967); Parker v. Philadelphia, 391 Pa. 242, 249, 137 A.2d 343, 347 (1958)). Fourth, if a municipality, in connection with competitive bidding, is empowered to do so, it may reject any and all bids in the absence of fraud, collusion, bad faith or arbitrary action (Highway Express Lines, Inc. v. Winter, 414 Pa. 340, 345, 200 A.2d 300, 302 (1964); R. S. Noonan, Inc. v. York School District, 400 Pa. 391, 396, 162 A.2d 623, 626 (1960); Straw v. Williamsport, 286 Pa. 41, 43, 132 A. 804, 805 (1926); American Pavement Co. v. Wagner, 139 Pa. 623, 630-31, 21 A. 160, 161 (1891)). Fifth, the requirement of competitive bidding for municipal contracts guards against 'favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts, and to secure the best work or supplies at the lowest price practicable. . . .' (Yohe v. Lower Burrell, 418 Pa. 23, 28, 208 A.2d 847, 850 (1965); Price v. Philadelphia Parking Authority, 422 Pa. 317, 332, 221 A.2d 138, 146 (1966)). (Emphasis in original.)

The Commonwealth and CDC would have us apply the first four of the principles just stated and not the fifth. It seems to us that if the requirement of open competitive bidding has not been observed, the

other principles are without application. Public officials have no discretion to ignore the requirement of open competitive bidding, no amount of regard for their intention to act for the public good can provide an excuse for a violation of law and the question here is not one of good faith but of power to disregard the law.

We conclude, therefore, that the Bureau's and the Acting Secretary's action in accepting and using CDC's second and revised cost proposal as a basis for awarding the contract was a violation of law.

AmTote assigns as a second ground for relief the asserted violation by the Commonwealth of Section 4.5 of the Request for Proposal. That provision, which we have reproduced at our Finding of Fact No. 11, provides that if a bidder makes an "innovative suggestion or recommendation" and if the Evaluation Committee determines that such suggestion or recommendation is "worth further exploration," other bidders should have the opportunity to conform their proposals "in accordance with the revised provisions." Section 4.5 of the Pennsylvania Request for Proposal, as were many other provisions of the Pennsylvania Request, was copied from a Request for Proposal prepared by the lottery officials of the State of Maryland. Since the Maryland Request for Proposal was not for competitive bidding and award to the lowest responsible bidder, but invited proposals which would be the subject of further negotiation between the State and bidders, the use of provisions of the Maryland Request was unwise. However, Section 4.5 says that innovative suggestions or recommendations might be made in the bids submitted and promises that if an innovative suggestion or recommendation made in a bid should be found worthy of explora-

tion, then other bidders would be entitled to conform their bids so as to offer the same innovative feature.

AmTote says that the cathode ray tube offered by CDC as an element of the terminal was an innovative suggestion or recommendation which the Evaluation Committee determined was not only worth further exploration but which was, in the Committee's judgment, so attractive that it provided the principal reason for the Committee's preference for CDC's technical proposal over AmTote's. AmTote says that while cathode ray tubes have been on the market for many years, their use in connection with agents' terminals for daily numbers games was innovative because the only game in operation before the Pennsylvania proposals were invited was one in New Jersey, where cathode ray tubes were not used at agents' terminals, although such tubes are in use at that lottery's central headquarters and were specified for use at the Pennsylvania headquarters.

We agree with AmTote that CDC's proposal to use the cathode ray tubes at agents' terminals was innovative and that AmTote should have been afforded the opportunity to conform its proposal so as to provide this equipment.

The Pennsylvania Request for Proposal specified the provision as terminal equipment of only "agent keyboard operated terminals." It will be remembered that the Request for Proposal, as amended, stated that it would be highly desirable that the "keyboard operated terminal be equipped with display for purposes of showing totals and subtotals due from multiple purchase transactions." The CDC equipment was demonstrated for the court at the trial. The cathode ray tube is in a housing separate from the keyboard operated terminal. The record shows that it was supplied to provide the highly desirable, but

not mandatory, provision for a display. Since the Request for Proposal, as amended, speaks of the desired display as something with which the keyboard operated terminal would be equipped, it seems to us that the suggestion of the use for this purpose of a cathode ray tube in a separate housing was indeed innovative.

That the Evaluation Committee believed it to be "worth further exploration" is illustrated by the Bureau's Director of Marketing who, clearly enamored of the cathode ray tube as a marketing device, described CDC's terminal as a thing of "magnificence" and AmTote's as displaying "mediocrity."

In short, we agree with AmTote that it should have been given the opportunity to conform its proposal so as to supply the cathode suggested by CDC, and that the failure of the Bureau and the Acting Secretary to afford that opportunity was a breach of a term of the Request for Proposal.

The daily numbers game has made profits of $800,000 per week. This amount of money is, of course, significant and the matter of its continuance is of concern not only to senior citizens but also to the general public. On the other hand, a provision of relief in this case is, in our opinion, essential in order to vindicate and maintain the integrity of the salutory principle of fair and open competition in public contracts promised to be awarded by competitive bid to the lowest responsible bidder. The contract between CDC and the Commonwealth was entered into on or about October 1, 1976 and the game went into operation on March 1, 1977. The contract is for a term of two years and if the contract follows the Request for Proposal, the Commonwealth may renew for three additional one year terms. We have concluded that by ordering the cancellation of the present

contract as of March 1, 1978 we will afford enough time for the Bureau to solicit new bids and award a contract for a daily numbers game to begin immediately upon the cancellation by the decree herein of the contract with CDC.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and subject matter of this suit.

2. The petitioner AmTote has standing to bring this suit and its petition for review stated a cause of action.

3. The Request for Proposal issued by the Bureau of Lotteries having stated that the contract proposed would be awarded to the lowest responsible bidder in accordance with the law of competitive bidding in Pennsylvania, required that the Bureau and Acting Secretary observe the law of competitive bidding, although the contract may have been one which might otherwise have been awarded by private treaty.

4. The Commonwealth, by its Bureau of Lotteries and its Acting Secretary of Revenue, in the conduct of the bidding in this matter violated the principle of law relating to competitive bidding that the bidding must be fair, open, honest and without favoritism in that they accepted from CDC, by private correspondence, a second and revised cost bid and one different from CDC's original cost bid, and in that they used CDC's second revised and different cost bid as a basis for awarding the contract to CDC as the putative lowest responsible bidder.

5. That the Commonwealth, by its Bureau of Lotteries and the Acting Secretary of Revenue, failed to comply with Section 4.5 of the Request for Proposal in that they did not afford AmTote the opportunity to conform its proposal to the innovative suggestion

or recommendation of CDC that a cathode ray tube be installed at agents' terminals.

## Decree Nisi

And Now, this 18th day of October, 1977, we do order and decree as follows:

(1) That the contract between the Commonwealth and CDC for a daily numbers game made on or about October 1, 1976 be and it hereby is cancelled and declared void and of no effect as of 12:00 o'clock A.M. March 2, 1978, and the parties respondent be and they hereby are enjoined from observing or implementing any provision thereof after that time and date.

(2) The Bureau of State Lotteries and the Secretary of Revenue shall, if it should be decided to continue the operation of a daily numbers game after March 1, 1978, invite proposals for contracts therefor to be awarded on the basis of competitive bidding to the lowest responsible bidder. AmTote shall be invited to participate in this bidding.

This Decree Nisi shall be entered by the Prothonotary on praecipe as the final decree unless exceptions are filed by any party within twenty (20) days after notice of the filing of this adjudication.

Per Curiam March 15, 1978:

This lawsuit in our original jurisdiction is before us on exceptions to findings, failure to make findings, conclusions of law, failure to make conclusions, and the decree nisi of the Chancellor, Judge Rogers, filed October 18, 1977.

The parties to the litigation are the plaintiff, now called petitioner, American Totalisator Company, Inc. (AmTote); the Pennslvyania Department of Revenue, its Bureau of Lotteries, an Acting Secretary of Revenue, and appropriate public officials, respondents;

and Control Data Corporation (CDC), an intervening party respondent. The subject matter of the suit is a request by the Bureau of State Lotteries for proposals for a daily numbers game. Both AmTote and CDC submitted proposals. The respondent Acting Secretary of Revenue on the recommendation of officials of the Bureau of State Lotteries chose for acceptance the proposal of CDC, and as a result the Commonwealth entered into a contract with that company. AmTote's Petition for Review alleges that the respondent public bodies and officials violated the law relating to public competitive bidding in awarding the contract to CDC. After an extensive trial and argument the Chancellor made findings and conclusions and entered the following decree nisi:

### DECREE NISI

AND Now, this 18th day of October, 1977, we do order and decree as follows:

(1) That the contract between the Commonwealth and CDC for a daily numbers game made on or about October 1, 1976 be and it hereby is cancelled and declared void and of no effect as of 12:00 o'clock A.M. March 2, 1978, and the parties respondent be and they hereby are enjoined from observing or implementing any provision thereof after that time and date.

(2) The Bureau of State Lotteries and the Secretary of Revenue shall, if it should be decided to continue the operation of a daily numbers game after March 1, 1978, invite proposals for contracts therefor to be awarded on the basis of competitive bidding to the lowest responsible bidder. AmTote shall be invited to participate in this bidding.

This Decree Nisi shall be entered by the Prothonotary on praecipe as the final decree unless exceptions

are filed by any party within twenty (20) days after notice of the filing of this adjudication.

None of the original respondents, *i.e.*, the Department of Revenue, the Bureau of State Lotteries and State officials, filed exceptions. Rather, we learned from subsequent proceedings not necessary here to detail, that the State decided to comply with the decree nisi and to that end drew up a new Request for Proposals and have received new proposals from both AmTote and CDC.

CDC's exceptions remaining after withdrawals are 45 in number. Rather than supporting each of the remaining exceptions explicitly, CDC's brief poses four arguments in general support of its exceptions alleging error by the Chancellor in his conclusions of law and in his failure to make conclusions as requested by CDC and in his decree nisi.

The first two of CDC's questions ask us to re-examine the decision of this Court on preliminary objections, which is to be found at *American Totalisator Company, Inc. v. Seligman and Control Data Corporation*, 27 Pa. Commonwealth Ct. 639, 367 A.2d 756 (1976). CDC says that we were wrong in holding in that case that AmTote had standing to maintain this action and that the bidding process undertaken by the State was subject to the law respecting competitive bidding in the Commonwealth. We thoroughly explored both of those subjects in our decision on the preliminary objections and we see no reason simply to repeat that discussion here.

CDC's contention that some facts brought out at the trial of this case concerning the use of proceeds of State lotteries demonstrate that Commonwealth taxpayers have no interest in, and therefore no standing to bring a suit questioning, the activities of the Bureau of State Lotteries, is wholly without merit.

CDC's third argument is that it was an error of law and an abuse of the Chancellor's discretion to grant relief in the absence of an allegation in Am-Tote's petition, or an explicit finding by the Chancellor, that the respondents acted in bad faith or were motivated by fraud in awarding the contract to CDC. The Chancellor concluded that the respondent State officials had violated the law of competitive bidding by entering into what amounted to private negotiations with CDC after CDC knew the amount of AmTote's bid and that in those negotiations CDC was permitted to submit a new, revised and lower bid without notice to AmTote and that the award of the contract to CDC was based on, among other considerations, the fact that CDC's amended bid was lower than AmTote's. The Chancellor believed that this was a violation of law, regardless of proof of actual fraud or bad faith. The case of *Louchheim v. Philadelphia*, 218 Pa. 100, 66 A. 1121 (1907), is persuasive authority for the Chancellor's action.

CDC's final argument is that the Chancellor erred in concluding that the cathode ray tube offered by CDC was an innovative suggestion or recommendation which under Section 4.5 of the Request for Proposals should have impelled the Bureau of State Lotteries to give AmTote an opportunity to amend its proposal to offer the same equipment. CDC's criticism of the Chancellor's conclusion in this regard totally over-looks findings based on undisputed evidence that CDC's equipment was preferred over AmTote's almost solely because of the proferred cathode ray tube, that an existing daily numbers game lottery did not use a cathode-ray tube at agent terminals and that cathode ray tubes were generally available on the market and could have been furnished by AmTote. Neither the respondents nor CDC have ever suggested

what would be an innovative suggestion or recommendation required by Section 4.5 to be submitted to other bidders, if the use of a cathode ray tube at the agents' terminals did not qualify as such.

AmTote's exceptions relate solely to the relief afforded by the Chancellor. It says that the Chancellor should not only have voided CDC's contract but should also have awarded the contract to AmTote. The Request for Proposal reserved to the Bureau the right to reject any and all bids. AmTote has not directed our attention to any Pennsylvania case in which the court directed the award of a contract to the plaintiff in this circumstance. More importantly, the petitioner here asks for relief which could harm the public interest. The public is, of course, much interested in the continued receipt by the State of the sum of $800,000 per week. It is the rule of law that a court of equity may refuse to enforce or protect legal rights where the public interest might be prejudiced. *Railroad Commission v. Pullman Co.,* 312 U. S. 496 (1941); *City of Harrisonville, Mo. v. W. S. Dickey Clay Mfg. Co.,* 289 U. S. 334 (1933); and *McMullan v. Wohlgemuth,* 444 Pa. 563, 281 A.2d 836 (1971). The Chancellor's discussion of the relief which should be afforded reveals a strong concern for the continued and uninterrupted operation of the daily numbers game, the substantial proceeds of which were used for important public programs.

AmTote finally says that the Chancellor erred in not requiring CDC to repay moneys received under the contract to the Bureau of State Lotteries. The facts that the contract awarded was one within the general powers of the Bureau of Lotteries to make, that the evidence did not justify a finding of bad faith, as distinguished from mere fecklessness, on the part of the respondents or CDC, that the Acting

Secretary had sought the advice of his lawyers, and that the Commonwealth had the benefit of CDC's services at a price no higher than AmTote originally bid,. tend to support the Chancellor's decision not to afford this type of relief. Furthermore, again, the provision of such drastic relief might have harmed, interfered with or embarrassed the continued highly successful operation of the daily numbers game. We discern no abuse of the Commonwealth's discretion with respect to the relief afforded by the decree nisi.

Accordingly, we enter the following

ORDER

AND Now, this 15th day of March, 1978, all of the exceptions of the American Totalisator Company, Inc. and Control Data Corporation are dismissed, and the Prothonotary is directed to enter the Chancellor's decree nisi as a final decree of the Court in this matter.